12510

LANE *ET AL. v.* NEW YORK LIFE INS. CO.

(145 S. E., 196)

September, 1925.

344

*Messrs. Thomas & Lumpkin* and *Louis H. Cooke,* for appellant,

*Messrs Lide & McCandlish,* for respondents,

October 19, 1928.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

The plaintiffs, Mamie M. Lane and Joe P. Lane, instituted two actions against the defendant, New York Life Insurance Company, in the Court of Common Pleas for Dillon County, for the reinstatement of two policies, Nos. 6926302 and 6926303, in the defendant company, issued upon the life of the plaintiff, Joe P. Lane, with Mamie M. Lane, his wife and co-plaintiff, named as the beneficiary in the policies, each policy being for the sum of $3,000. The pleadings in the cases are practically the same, and, by agreement, the cases were tried and heard together before his Honor, Judge E. C. Dennis, on the testimony taken before the Master for Dillon County, to whom the cases were referred for that purpose only. From the decree of his Honor, Judge Dennis, which was in favor of the plaintiffs, the defendant has appealed to this Court, upon exceptions which will be reported.

His Honor, Judge Dennis, after having issued the decree above mentioned, bearing date September 19, 1925, later issued a supplemental decree, dated September 26, 1925, requiring the plaintiffs, within 20 days from the filing of his decree, or, in the event of an appeal to the Supreme Court in the actions, within 20 days of the filing of the remittitur, or any final decision in the cause, to pay or tender payment of the amount of all premiums due and unpaid at this time, together with interest from the date of the checks offered in evidence by the plaintiffs as covering some of the premiums involved, and with a provision for the payment of interest on the other premiums, and, further, ordering and declaring the policies null, void, and of no effect in case of failure to comply with the said order. The plaintiffs appealed from this supplemental decree.

The transcript of record contains a description of the complaint in but one case, that involving policy No. 6926303, but it is stated in the record that the complaint in the other

case is identical, except as to one paragraph, to which we shall hereafter call attention.

The pertinent allegations of the complaint in the case under consideration, that involving policy 6926303, are, in substance, that, the defendant, for and in consideration of a premium of the sum of $109.62 paid to it, issued this policy upon the life of the plaintiff, Joe P. Lane, in the sum of $3,000, with his wife, Mamie M. Lane, named as the beneficiary; that subsequently, February 15, 1922, the plaintiff, Joe P. Lane, and the defendant entered into a contract whereby the premiums mentioned in the policy were changed from annual to semiannual payments, and that the plaintiffs have complied with all the obligations and duties devolved upon them, under the terms of the policy and subsequent change or contract; that, notwithstanding these facts, the defendant, on or about the 29th day of June, 1922, wrongfully and unlawfully attempted to cancel said policy of insurance, as a valid and outstanding contract, without any cause or reason therefor. The complaint contains, further, allegations to the effect "that plaintiff's rights and interests under said policy of insurance are valuable, and that the plaintiffs are entitled that said contract be recognized by the defendant, and the defendant be required to maintain and recognize the said contract as valid, binding and outstanding obligation, and that said defendant had no right to cancel or forfeit said contract," and "that the attempt on the part of the defendant to so forfeit and cancel said contract is an injury to these plaintiffs." The complaint closed with a prayer for appropriate relief.

As stated, the complaint in the other case, according to statement in transcript, is identical with the foregoing, except as to paragraph 4, "where the policy is copied, the terms of the policy not being the same," the policy number is 6926302, and the premium is $106.98.

The defendant in its answer, under the first defense, admitted that, as a corporation engaged in the life insurance

business, it issued the policy in question, but denied the other material allegations of the complaint, except these specifically admitted under its second defense. Under defendant's second defense, defendant admits having entered into a written agreement with the plaintiff, Joe P. Lane, February 15, 1922, whereby the manner of payment of premiums under this policy (No. 6926303) was changed from the annual basis to a semiannual basis, beginning with the first premium in March, 1922; and alleged that the semiannual premium on this policy was $57, and alleged that on March 9, 1922, the insured, Joe P. Lane, paid to the defendant the sum of $10.50 and signed a form of *blue note* agreement whereby the time for the payment of the premium was extended to June 9, 1922, and at that time the cashier of the defendant's office at Columbia, S. C., gave a receipt on a regular form for that purpose to the insured, Joe P. Lane, and that said receipt set forth the form of note given as stated, and that under the terms of said receipt and note it was provided:

"That if this note is paid on or before the date it becomes due, such payment, together with said cash, will then be accepted by said Company as payment of said premium, and all rights under said policy shall thereupon be the same as if said premium had been paid when due; That if this note is not paid on or before the day it becomes due, it shall thereupon automatically cease to be a claim against the maker, and said Company shall retain said cash as a part compensation for the rights and privileges hereby granted, and all rights under said policy shall be the same as if said cash had not been paid or this agreement made, except only that the time within which the owner may make a choice of benefits after lapse, as provided in said policy, is hereby extended for three months after the due date of this note, but no longer; That said Company has duly given every notice required by its rules or by the laws of any state in respect to said premium, and in further compensation for the rights and privileges hereby granted the maker hereof has agreed

to waive and does hereby waive, every other notice in respect to the said premium or this note, it being well understood by said maker that the said Company would not have accepted this agreement if any notice of any kind were required as a condition to the full enforcement of all its terms."

The defendant further alleged that the said insured failed to pay the amount stated in the note agreement on or before June 9, 1922, and that the policy lapsed as of the due date of the premium, to wit, March 9, 1922, and that of which fact the insured, Joe P. Lane, was thereafter advised; that on June 29, 1922, the insured wrote defendant's Columbia, S. C., branch office, stating that he had been under the impression that the note was due July 9, 1922, and not June 9, 1922, and inclosed his check for a sum sufficient to pay the note in question, and the check was returned to the insured, and the insured advised by defendant's Columbia, S. C., office, that he might apply for reinstatement and remit with this application the amount necessary to pay the note, and that such "remittance would be held subject to insured's order pending the Company's consideration of the application." Thereafter, on or about July 10, 1922, the insured sent to the Columbia branch office the said application for reinstatement, and a letter or statement from a certain doctor in the City of Baltimore concerning his health, and, along with said application for reinstatement, the insured inclosed his check for a sum sufficient to pay the note described above, and, upon receipt of these papers, the insured was advised that the same had been forwarded to the home office of the Company for attention, and, pending this defendant's consideration of his application for reinstatement, the remittance would be held subject to his order; that, after a thorough consideration of said application for reinstatement by this defendant in its home office, and after considering carefully the statement of Dr. Julius Friedenwald of Baltimore, Md., which accompanied the application for reinstatement as aforesaid, which statement showed that the insured had been

suffering from a *gastric ulcer*, this defendant determined and decided that it could not reinstate the policy described above, which had lapsed for nonpayment of premium on March 9, 1922, and on the 7th day of August, 1922, advised the insured, Joe P. Lane, to this effect, and returned the check which he had sent with his application for reinstatement as set forth hereinabove.

The defendant further alleged that it received from the insured August 15, 1922, a check covering the premium due on the policy in question for September 9, 1922, and March 9, 1923, and that the check was returned to the insured by the Columbia branch office; and that again on March 29, 1923, the defendant received from the insured a check, at defendant's Columbia branch office, for a sum claimed by insured to be sufficient to cover the premium payment due March 9, 1923, and that this check was returned to the insured, with advice to him that the Company could not consider the matter of reinstatement of the policy until it received a medical examination by Dr. Craig, of Dillon, S. C., on a form which was sent to the insured at said time, informing the insured in said letter that:

"If the insured would have such examination and return the check for an amount sufficient to cover the premium due to date and also check for 1923 premium, with interest at the rate of five per centum on premiums not paid from March 9, 1922, the reinstatement of the policy would be considered; that the insured refused to have this examination or file an application for reinstatement."

Under this alleged statement of facts, the defendant contends that the policy lapsed for nonpayment of premium, and that there exists no right of reinstatement of the policy.

The transcript contains a statement that the answer in the other case is identical with this answer, except as to the number of the policy and the amount of the premium.

We have quoted at length from defendant's answer for the purpose of setting forth clearly defendant's viewpoint, and on account of its bearing on the case.

By reference to the decree of Judge Dennis, wherein his Honor ordered adjudged and decreed the policies involved to be in full force and effect, it will be observed that his Honor based his decision upon the principle announced in the case of *Brown v. Life Insurance Co. of Virginia,* 114 S. C., 203, 103 S. E., 555. After the case at bar was heard by Judge Dennis, and before the hearing of the appeal by this Court the opinion in the case of *Antley v. New York Life Insurance Co.,* 139 S. C., 23, 137 S. E., 199, was filed, in which case this Court overruled the principles announced in the *Brown case,* in so far as that case holds that the beneficiary's interest is vested although the right to change the beneficiary is reserved in the policy.

Counsel for respondents, however, take the position that the *Antley case* does not overrule the *Brown case* in so far as the questions in the case at bar are concerned. Their position is that, while a beneficiary's right is not a *vested* right, it is something more than a mere contingent right, that it is a substantial right which may be divested in the manner provided in the policy, or recognized by the Courts, and, until this is done, the right exists; and they contend that, while it is true that under the *Antley case* Mrs. Lane did not have a vested right in the policy involved in the case at bar, she did have very substantial rights therein, and that such rights "were subject to two conditions in the policy *only,* to wit: (a) That Mr. Lane might change the beneficiary, but he could only do this by complying with the terms of the policy; and (b) that Mr. Lane "had the right, without the consent of the beneficiary or beneficiaries, to receive any benefits, exercise every right, and enjoy every privilege conferred upon the insured by the policy." In this connection counsel for respondents call attention to the fact that, at the time the blue notes were given, "Mrs. Lane's rights

under the policy *had not been divested,* the beneficiary had not been changed and no right or privilege conferred upon Mr. Lane by the policy had been exercised," and that, pursuant to an agreement independent of the policy, the insurance company accepted from the insured a partial cash payment and the blue notes; and contend that the following quotation from the *Brown case* is applicable to the questions raised in the case at bar, to wit:

"There is no question that, if the note had not contained the condition as to forfeiture, it, together with the $5.19 in cash, would have constituted payment of the premium that was due on the 25th of February, 1919, and would have had the effect of continuing the policy in full force."

Counsel also call attention to the following quotation from the *Brown case:*

"The policy itself does not contain a provision that in case a note be given for the premium, and be not paid at maturity, the policy shall be forfeited."

Summing up, the position of respondents' counsel is, conceding that the assignment of a policy, as held in the *Antley case,* is tantamount to a change of beneficiary, "that while under the *Antley case* Mrs. Lane did not have. an absolute vested right, she did have rights thereunder which could not be affected by the contract made by the insured and the insurer, independently of the policy, while her rights had not been divested in the manner provided by the policy." In support of this position counsel cite the case of *Merchants' Bank v. Garrard,* 158 Ga., 867,.124 S. E., 715, 38 A. L. R., 102, cited in the opinion in the *Antley case.*

The position of counsel for respondents is not without merit, but, under the view we take of the case, it is not necessary to pass upon this proposition. According to our conception, the case should be decided upon broad, equitable principles, and, with that end in view, we shall discuss at length the facts in the case. In the discussion, let it be understood that we are dealing with the case that involves policy

No. 6926303, and our decision in that case will apply to the other case.

On the 9th day of March, 1921, the defendant, New York Life Insurance Company, in consideration of a premium of the sum of $109.62, paid to it, entered into a contract of insurance, whereby it insured the life of the plaintiff, Joe P. Lane, under policy No. 6926303, in the sum of $3,000, in favor of the plaintiff, Mamie M. Lane, beneficiary. The contract of insurance called for the payment of $109.62, as premium on each annual date, March 9th of each year. On February 15, 1922, on application of the insured, an agreement was entered into between the insurer and the insured, whereby it was agreed that the premiums on this policy, No. 6926303, should be payable "in equal one-half installments of fifty-seven and no/100 dollars each, on the 9th days of March and September, instead of annually as provided in said policy." The said agreement contained also the following additional provisions: "That all the conditions of said policy as to the payment or nonpayment of any premium shall apply to any installment payable under the preceding agreement," and "all the conditions of said policy, except as herein modified, remain in full force."

On March 4, 1922, the insured wrote the insurer, at the Columbia, S. C., office, as follows:

"I want you to send me a 90-day note for one-half of the premiums due on these two policies. In other words, I want to pay 50% on each policy, and carry balance 90 days for me on my note. Please fix up notes to this effect, and send them to me at once."

In reply to this letter the insurer, on the 8th of March, 1922, wrote the insured as follows:

"We are enclosing blue notes for $46.50 for extending payment of the premiums on the above policies two months. Kindly sign these notes and return with your check for $21."

A check for the said sum of $21 was promptly sent the insurer by the insured, together with the notes, duly executed. The following is a copy of the note involving policy No. 6926303:

"Pol. No. 6926303.                    March 9th, 1922.

"On or before June 9th, 1922, after date, without grace, and without demand or notice, I promise to pay to the New York Life Insurance Company forty-six and 50/100 dollars at S. C. Branch Office, Columbia, S. C., value received, with interest at the rate of five per cent. per annum.

"This note is accepted by said Company at the request of the maker, together with ten and 50/100 dollars in cash, on the following express agreement: That although no part of the premium due on the 9th day of March, 1922, under policy No. 6926303, issued by said Company on the life of ————— has been paid, the insurance thereunder shall be continued in force until midnight of the due date of said note; That if this note is paid on or before the date it becomes due, such payment, together with said cash, will then be accepted by said Company as payment of said premium, and all right under said policy shall thereupon be the same as if said premium had been paid when due; That if this note is not paid on or before the day it becomes due, it shall thereupon automatically cease to be a claim against the maker, and said Company shall retain said cash as part compensation for the rights and privileges hereby granted, and all rights under said policy shall be the same as if cash had not been paid nor this agreement made, except only that the time within which the owner may make a choice of benefits after lapse, as provided in said policy, is hereby extended for three months after the due date of this note, but no longer; That said Company has duly given every notice required by its rules or by the laws of any state in respect to said premium, and in further compensation for the rights and privileges hereby granted the maker hereof has agreed to waive, and does hereby waive, every other notice in respect to said

premium or this note, it being well understood by said maker that said Company would not have accepted this agreement if any notice of any kind were required as a condition to the full enforcement of all its terms.

"$46.50          [Name] JOE P. LANE.
"[Address] Dillon, S. C."

The two notes were identical. It will be observed that, while the letter from the insurer to insured stated that the blue notes for $46.50 for extending payment of the premiums on the policies were two months, the notes were made payable June 9th, making the time three months, that is, 90 days, as requested by the insured. See above letter of the insured dated March 4, 1922.

On the 26th of June, 1922, the insured wrote the insurer as follows:

"I gave you a note some time ago for payment of part of premium on policy of insurance. Please write me by return mail when that note matures, as I desire the notes taken care of. I think the note is for about $26.00, and please write me if I must pay on exact date due, or have a little time after it becomes due."

June 27, 1922, the insurer wrote the insured as follows:

"On March 11th, you paid $10.50 for a blue note settlement extending premium for two months, due 6/9/22. This note for $46.50 has not been paid, and we regret that there is no way that we can extend payment further. Please complete the attached self-health certificate and return with your check and interest."

June 29, 1922, the insured wrote the insurer as follows:

"Your letter written on my letter dated by you the 27th has been received and in reply thereto will state that as I understood it there were two policies of insurance, Nos. 6926302 and 6926303, which in April I got you to change from annual premium to semiannual premium some thirty days before the time expired for the payment of the annual premium then about due and you changed those premiums

in both policies from annual to semiannual as aforesaid considerable time before said annual premiums were due. I gave you then part cash payment on each of those semiannual premiums and the balance of each premium on each policy in separate notes. Afterwards my impression was all along that those notes were ninety-day notes.

."On April 18th I went to Baltimore and was examined by Dr. Julius Friedenwald and he decided that I had an ulcerated stomach and I went to Mercy Hospital in Baltimore and was treated by Dr. Friedenwald for almost eight weeks. I came back home on the 10th day of June, one day after those notes were claimed to have been due by you. My health is good. I am getting along fine and Dr. Friedenwald pronounced me cured before I left.

"Now, then, I received no notice whatsoever concerning the date these notes were due while in the hospital or since I have returned therefrom. I left my stenographer in charge of my office with instructions to report to me everything that came to me by mail or otherwise, which she did, and I am sure that no notice of the maturity of these notes reached my office during my absence. While in the hospital I thought sure those notes would mature in July instead of June and did not give them any attention on that account, because as aforesaid, I was certain in my mind when I did think about them, that they would become due in July.

"Not only that, however, but these policies were disability policies and at the time these notes matured I was disabled and had been so disabled for eight weeks to attend to any business as I was in the hospital all the time.

"Therefore, I cannot sign the paper which you sent me to sign along with your letter of June 27th, which you call Request for Reinstatement. As I understand these policies, disability avoids payment of premium, anyhow, and not only that, under the fact that I was not notified I could not be expected to pay a note exactly when due, a copy of which I did not have.

"Therefore I am sending you today two checks for $47.-25 each so as to be sure that I am making the checks large enough to recover the two blue notes you have, if you have two, and I think you have. As aforesaid, my health is good, I am getting along all right but I cannot say that I have not been sick in the last twelve months, and therefore I am giving you the full facts at this time so that if we are going to have any trouble about these policies we will have it now and be through with it. I am going to take the position that these policies are in force and if necessary establish the principle in Court that they are still in force. Therefore, I am tendering you these checks for the amount due on the notes and I am sure that I am enclosing sufficient to cover the face of the notes with interest.

"I have always been a friend to your company and have assisted you and advocated your company and in many respects have been the cause of your company getting insurance that you would not have gotten otherwise.

"If you attempt to forfeit these policies you will be doing so from a technical standpoint and I am sure you will not be able to get by with it but I do not believe your company would try to take any such stand.

"Hoping that this matter will be closed up at once and properly closed, I am."

In reply to the above letter, the insured received from the insurer the following letter:

"We, of course, regret that notes due June 9th on these policies were not paid when they became due, and that the policies were allowed to lapse. We also regret that you did not receive the notices of these notes being due, but according to our records notices were mailed from this office, addressed to you at Dillon, S. C., on May 30th.

"You are correct when you state that you were under the impression that the notes that you gave were ninety-day notes. The premiums on the policies were due March 9th. Notes were dated the due date of the premium and drawn

payable June 9th. For your information, I attach a blank form of note which is the kind of note you signed in connection with the premiums due March 9th under each of these policies.

"Your two checks, dated June 29th, 1922, drawn on the First National Bank of Dillon, payable to the New York Life Insurance Company for $47.25 each, are returned herewith.

"These policies stand lapsed for nonpayment of notes due June 9th, within the time specified in the notes.

"We will, however, be very glad to consider the reinstatement of these policies and would suggest that you complete application for reinstatement of the policies sent you several days ago and state in the blank space provided for that purpose that you were treated by Dr. Friedenwald for about eight weeks at the Mercy Hospital for an ulcerated stomach. I would suggest that you write to Dr. Friedenwald and get him to give you a statement over his signature, giving full details of your illness, giving his diagnosis of treatment prescribed and result of that treatment. You can send that application in to us with the settlement covering the payments due on notes with interest at the rate of 5% per annum from March 9th to the date of your remittance. The amount of the note under each policy is $46.50.

"Any remittance received from you, however, will be held subject to your order, pending the Company's consideration and approval of your application for reinstatement."

The application was filled out according to instructions, and sent to the insured, together with a certificate of the eminent physician, Dr. Friedenwald, of Baltimore, and check for the amount of money requested, and in connection therewith the insured wrote the following letter to the insurer:

"Enclosed find the original statement of Dr. Julius Friedenwald as requested of me by you in your letter of July 3rd.

"Enclosed also find two checks, each for $47.25, both dated June 29, 1922, which I previously sent you. Enclosed

also find application by me for reinstatement for policies Nos. 6926302-303.

"I am signing this application for reinstatement, and writing you this letter and sending you this statement of Dr. Friedenwald's, and in fact I am doing all of this without prejudice to my original rights.

"According to my contentions I do not have to do any of this, but my policies are still in force at the present time. I am merely doing this as probably the easiest means for getting the entire matter adjusted, but none of my actions in complying with your request shall waive any of my rights under the law of contracts, policies, premiums," etc.

Attached to this letter was the application and the certificate of Dr. Friedenwald, as follows:

"Application to New York Life Insurance Company. Home Office: 346 Broadway, New York, N. Y. Without Prejudice. For Reinstatement of Policy No. 6926302-303 Amount $———, which lapsed for nonpayment of premium due on the 9th day of June, 1922.

"I hereby apply for reinstatement of the above numbered Policy, and for the purpose of inducing said Company to reinstate said Policy and with the understanding that it will rely and act on what I here say, I represent to it that I am now, to the best of my knowledge and belief, in good health; that within the past twelve months I have not had any illness, nor consulted nor been treated by any physician, nor been prevented by illness or accident from continuously pursuing my customary occupation which is the same now as it was when I applied for said Policy; that no Life Insurance Company has within the past twelve months examined me either on, or in anticipation of, an application for life insurance, or for the reinstatement of life insurance, without issuing or reinstating such insurance; and that no application for insurance on my life is now pending.

"(If there is any exception or qualification to the above, write it out here fully.)

"Treated by Dr. Julius Friedenwald, Baltimore, Maryland, at Mercy Hospital, from 17th April till June 10th, 1922, for gastric ulcer.

"If the evidence of my insurability is satisfactory to the Company and it has received in cash all sums the Policy requires to be paid for reinstatement, then, and not until then, said Policy shall be deemed reinstated. If said Policy is not so reinstated, I agree to accept return of all sums paid in connection with this application, without interest.

"Signature of insured Joe P. Lane.

"P. O. Address          Dillon, S. C.

"Name of employer ————.

"Address of employer ———— —..

"Dated at Dillon, S. C., this 11 day of July, 1922."

EXHIBIT N.

"Letter of Dr. Julius Friedenwald, date July 8, 1922, sent in with application for reinstatement:

"Julius Friedenwald, M. D.

"Theodore H. Morrison, M. D.

"Paul Foreman Wiest, M. D.

"1013 N. Charles Street

"Hours: 10 A. M.—1 P. M.

"Baltimore, July 8, 1922.

"This is to certify that Mr. Joe P. Lane consulted me on April 17th complaining of indigestion, which consisted of pain in the stomach (relieved by food, but the discomfort recurring later on) gas, constipation and belching.

"Physical examination was practically negative, except for a tender area in the epigastrium. A gastric analysis showed a total acidity of 40, free Hcl. 20; blood pressure 120/70.

"An X-ray examination made by Dr. F. H. Baetjer revealed a definite pyloric ulcer and Enteroptosis.

"My diagnosis was a gastric ulcer. He was sent to the Mercy Hospital on the 18th of April and was discharged on

June 10th in excellent condition after having taken a thorough medical ulcer rest cure.

"[Signed] Julius Friedenwald, M. D."

Receipt of this letter, together with all papers, was duly acknowledged, stating that the papers had been sent to the New York office for further attention, and stating that, pending the consideration of the application, the remittance received would be held subject to the order of the insured.

Later the insured received from the insurance company the following letter:

"We regret to advise that although the Company has given the reinstatement of your Policy careful consideration, they are obliged to decline to reinstate either Policy. We are returning herewith your checks for $47.25 on each policy given in connection with your application for reinstatement."

August 8, 1922, Mr. Lane, the insured, wrote the insurance company this letter:

"In regard to my policies of insurance I want you to send me a statement giving all policy numbers, amounts, due dates, whether annual or semiannual, that is of all the policies that I have with your Company.

"I received the checks you returned where you refused to accept premiums for those two policies. You are making a big mistake.

"P. S. Please write me exact dates, amounts of when premiums come due according to your books on my policies numbers 6926302–303."

In response to this letter, the insurance company wrote Mr. Lane giving the information requested.

On August 15, 1922, Mr. Lane, the insured, sent the insurance company the following letter, together with check for the sum of money mentioned therein, $216.60:

"Enclosed you will find my check for the sum of $216.60. This is the total annual premiums for the above mentioned policies for the next twelve months in advance. This is a

tender of the payment of twelve months premiums on both of said policies above mentioned. This covers semiannual premiums due September 9, 1922, and March 9, 1923. I am making this as a tender of my policies above-named, as I see the law at the present time in said matter. I am not going to lose this insurance, therefore, am taking every legal step necessary to keep said insurance in force.

"Now write me either acceptance or refusal of the advanced premium payment.

"If you object to the form of the tender, say so, and I will have the tender made to you in actual cash. I hope you will not put me to the trouble of actually making the tender in cash money, but I can readily do so if you prefer that I should offer you cash.

"I am making this tender purely to protect my legal rights in the matter, and desire your immediate acceptance or refusal on said payment of premiums. This tender is made in the name of, and for the benefit of Joe P. Lane, the insured, and also my wife, the beneficiary."

In letter of August 16, 1922, the insurance company returned to Mr. Lane check referred to in above letter, and in this letter stated:

"The Company has carefully reviewed evidence of insurability with your application for the reinstatement of these policies and found that evidence of insurability was not up to the Company's standard and reinstatement of the policies declined. We could thank you to please acknowledge receipt of your check which is being returned herewith."

Mr. Lane acknowledged return of the check referred to.

Again on March 29, 1923, Mr. Lane wrote the Company for the purpose of trying to get this insurance matter shaped up with the Company, and sent the amount of money stated in his letter:

"Enclosed you will find my check for $216.60 in full payment of the premiums on each of the above-mentioned policies due March 9, 1923. This tender that is being made is

within the thirty-day period of grace. I have already tendered you at different times premiums on these policies, but you have refused to accept them. You will recollect that I tendered you $216.60 on the 15th of August, 1922, which would cover premiums on these policies from that date. Previous to that I also tendered to you, in accordance with your request, two checks for $47.25 each, dated June 29, 1922.

"This tender I am making now is in addition to all other tenders heretofore made, although the tender of August 15, 1922, would run the policies longer than this date, that is, March 29, 1923. Nevertheless, I am tendering this today for the year beginning March 9, 1923. If there is any objection to the manner or substance of this tender, please say so, and either accept or refuse by letter by return mail."

The insurance company replied to the above matter as follows, returning check:

"We return herewith your check on the First National Bank of Dillon, S. C., for $216.60. As your policies lapsed for the nonpayment of the March, 1922, premiums, we cannot apply the attached check towards the payment of the March, 1923, premiums, or give the matter of reinstatement our attention until we receive medical examination by Dr. L. R. Craig, of Dillon, S. C., on the enclosed form, without expense to the Company.

"If you will return completed examination with checks covering the annual premium due March 9, 1922, of $109.62 on Policy 6926303; and $106.98 on Policy 6926302; also checks for the March, 1923, annual premiums and interest at the rate of 5% per annum from March 9, 1922, to date of repayment, we will be glad to consider reinstatement of your policies."

This closed the correspondence, and suit was afterwards commenced.

In addition to identifying the several exhibits referred to, Mr. Lane, the insured, testified that the two notes referred

to in the letters introduced in evidence were signed by him and returned to the company, together with his check for the difference in cash, whatever that might be; that one of the notes was $45.15 and the other for $46.50; that the "difference in cash due on semiannual premiums at that time was forwarded with check and duly accepted." Mr. Lane further testified:

"I went to Baltimore, Md., to Dr. Julius Friedenwald on April 16, 1922, was examined on April 17th by Dr. Friedenwald, and on his advice went to the Mercy Hospital and remained there under his treatment until June 10th. I was discharged by Dr. Friedenwald on June 10th. I arrived at home in Dillon on the morning of the 11th of June. I went to the office the next day and spent about thirty minutes there. I spent nineteen hours in bed the last day that I was in the hospital, and after coming home I continued to spend from fifteen to twenty hours in bed for a period of two weeks, or probably more. I came to the office every morning during that period, but was not strong enough to attend to my business very much. I was so happy to get home that I did not care about business. I gradually increased my time spent at the office, and at end of thirty days I spent five hours at the office. I gradually improved until I was back on the job within sixty days of my return. The letters that I wrote, and that have been introduced into evidence are true, to the best of my knowledge. My wife, Mamie M. Lane, knew nothing of the transaction, with the exception of the fact that I did have the insurance with the Company."

Mr. E. T. Ridgeway, cashier in defendant's Columbia, S. C., office, testified at the reference, and, in addition to testifying concerning the correspondence offered in evidence and certain formal matter, gave the following testimony pertinent to the questions involved:

"Q. Are you familiar, from your records, with the blue note settlement that was taken March 2, 1922? A. Yes, sir.

"Q. From the correspondence introduced in the case, and an application for reinstatement of the two policies in question, was later sent in to the branch office at Columbia, did you handle this transaction? A. Yes, sir.

"Q. Where was the application, Exhibit M, forwarded by you? A. To the home office in New York City.

"Q. Why was it sent to the home office? A. Because it could not be handled in the branch office. I have not the authority.

"Q. Did the home office accept or reject the application for reinstatement? A. They rejected it.

"Q. Mr. Ridgeway, in the operation of your office at Columbia, and under your supervision, are notices of due dates of premium notes, commonly called blue notes, sent out from your office? A. Yes, sir.

"Q. What was the custom in your office concerning such notices? A. To send a notice of the note due to the insured, also a copy of the notice to the agent who wrote the business.

"Q. Was that a carbon copy? A. Yes, sir.

"(It is understood that the above objection goes to all this kind of testimony.)

"Q. I show you two carbon copies of notice dated March 16, 1922, covering two policy numbers; the same has been introduced in evidence in this case. From whom did you receive these two copies of notices? A. From Agent Rufus Edwards.

"Q. Did he write these policies as agent for the Company? A. Yes, sir.

"(Offering in evidence copies of notices.)

"Q. Where did Mr. Edwards deliver these notices to you? A. In my office.

"Q. Where does Mr. Edwards live? A. In Florence, S. C.

"Q. Will you state whether the two copy notices which I have shown to you, and are marked 'CC' and 'DD,' are copies of the original made out in your office in Columbia, under

the customs and plans referred to in your testimony? A. Yes, carbon copies with the exception of the address on the notice.

"Q. Why is the address not made out in carbon copy? A. Because the original is sent to the policy holder and the carbon to the agent.

"(Form of receipt given to Mr. Lane introduced in evidence and marked Exhibit EE.)

Cross-examination:

"Q. Did you mail them? A. Not personally, but under my direction. I mean that I did not do it personally, but they were mailed by other parties.

"Q. Do you recollect this specific instance? A. No, sir." Mr. Lane in his reply testified:

"I did not receive any notice whatsoever of the due date of the notes after signing and sending same in. Neither did my wife receive any such notice. I am worth the sum of $4,000, above all liabilities and exemptions allowed by law. I am the owner of 156 acres of real estate and one-half interest in 148 acres of real estate in Dillon County, also I consider myself solvent, and was solvent at the due date of the blue notes."

The deposition of Mr. John C. McCall, of defendant's New York office and second vice president of the Company, was introduced in evidence at the reference, whose testimony for the most part was with reference to the matters set forth in the letters referred to and quoted hereinabove. In the course of Mr. McCall's testimony he stated that the application of the insured for reinstatement and the certificate of Dr. Friedenwald were considered by the several departments of the Company, the application refused, and the insured notified.

This constitutes the testimony in the case pertinent to the issues involved. On this state of facts it is the position of the plaintiffs that the policies in question should be declared of full force and effect; whereas, the defendant con-

tends that the policies have long since lapsed for nonpayment of premiums, and that no right for reinstatement of the policies exists, and contends that the Court should declare the policies null and void and of no effect.

Which position is correct? In answering this question we should, according to our view, as stated at the outset, be guided by broad equitable principles, applicable to the facts in the case.

One of the principles well recognized by our Courts of equity is that "the Courts do not look with favor upon forfeitures"; another is that "Equity will not suffer a wrong without a remedy."

The provision in the policy under which the insurance company claims the right to cancel the policy, and, in conjunction with the provisions contained in the "blue note" quoted above, works a forfeiture, reads as follows:

"If any premium is not paid on or before the day it falls due the policyholder is in default; but a grace of one month (not less than thirty days) subject to an interest charge of five per centum per annum will be allowed for the payment of every premium after the first, during which time the insurance continues in force."

We can well understand how Mr. Lane, sick as he was, did not keep a strict account of the time or the due date of the notes. Soon after Mr. Lane executed and forwarded the notes to the insurance company, he became sick and went to Baltimore, Md., for treatment, where he remained under treatment until June 10, 1922, at which time he returned to his home, Dillon, S. C., arriving there the following day. But it was several days before he returned to his office, except for a few minutes each day, remaining at his residence the greater part of each day for a period of about two weeks for the purpose of recuperating before taking up his work at his office. On June 26, 1922, Mr. Lane wrote the insurance company as follows:

"I gave you a note some time ago for payment of part of premium on policy of insurance. Please write me by return mail when that note matures, as I desire the notes taken care of. I think the note is for about $26, and please write me if I must pay on exact date due, or have a little time after it becomes due."

From this letter it clearly appears that Mr. Lane did not know the notes were past due, but, on the other hand, he was under the impression that the notes were not yet due, and that he desired to get the due date and arrange for making payment. He even asked in this letter if the Company would require payment on the due date, or if he might have a little time. On June 27, 1922, the insurance company replied to Mr. Lane's letter in the following language:

"On March 11th, you paid $10.50 for a blue note settlement extending premium for two months, due 6/9/22. This note of $46.50 has not been paid, and we regret that there is no way that we can extend payment further. Please complete the attached self-health certificate and return with your check and interest."

It will be observed that the reply was rather "blunt," and did not give Mr. Lane the information requested, except in an indirect way. But from this letter Mr. Lane learned what had taken place.

June 29, 1922, Mr. Lane wrote the insurance company again, going more into detail, and sending his check to cover all premiums, together with interest, and later wrote additional letters along the same line, again sending his check for all premiums and interest thereon, which checks were promptly returned, which letters are quoted above along with the other testimony.

Considering the correspondence between the parties in connection with the provisions contained in the policies, as well as the testimony of Mr. Lane and the testimony of the witnesses for the defendant, we are forced to the conclusion that Mr. Lane was honestly under the impression and

belief that the notes in question were not due until in July; that the 30-day grace period stipulated in the policies was intended for his benefit in the payment of notes as well as premiums, regarding the notes as substitutes for the premiums; and, further, that Mr. Lane fully intended to meet his obligations when due, unless granted additional time by the insurance company.

On the question of notice, the insurance company ■ contends, and correctly so, that the notes in question provided that no notice should be necessary. Following this provision strictly, no notice was necessary. However, in this connection, we call attention to the testimony of Mr. Ridgeway, officer and witness for the insurance company. On this phase of the case Mr. Ridgeway testified:

"Q. Mr. Ridgeway, in the ·operation of your office at Columbia, and under your supervision, are notices of due dates of premiums notes, commonly called blue notes, sent out from your office?

"A. Yes, sir.

"Q. What was the *custom* in your office concerning such notices?

"A. To send a notice of the note due to the insured, also a copy of the notice to the agent who wrote the business."

It is clear from this testimony that it was the custom ■ and is the custom of the insurance company to notify the insured of the due date of premiums notes, commonly called blue notes, such as the notes in question in this case. This being the custom of the insurance company, to give to its policyholders notice of the due dates of such notes, then, regardless of the provision in the notes, the plaintiff, Mr. Lane, was entitled to the benefit of this custom. That is, he should have been treated as other policyholders and given notice of the due dates of the notes. Mr. Lane testified that he received no notice; that he was not so notified. It is the contention of the insurance company· that Mr. Lane was notified. An examination of the testimony

convinces us that the Circuit Judge was correct in finding as a fact that the insurance company did not notify Mr. Lane of the due date of the notes. The testimony on the part of the insurance company on this point is as follows, Mr. Ridgeway, cashier, testifying:

"Q. I show you two carbon copies of notice dated March 16, 1922, covering two policy numbers; the same has been introduced in evidence in this case. From whom did you receive these two copies of notices?

"A. From Agent Rufus Edwards.

"Q. Did he write these policies as agent for the Company?

"A. Yes, sir. (Offering in evidence copies of notices.)

"Q. Where did Mr. Edwards deliver these notices to you?

"A. In my office.

"Q. Where does Mr. Edwards live?

"A. In Florence.

"Q. Will you state whether the two copy notices which I have shown to you, and one marked 'CC' and 'DD' are copies of the original made out in your office in Columbia under the customs and plans referred to in your testimony?

"A. Yes, carbon copies with the exceptions of the address on the notice.

"Q. Why is the address not made out in carbon copy?

"A. Because the original is sent to the policyholder and the carbon to the agent."

On cross-examination, Mr. Ridgeway testified on this point as follows:

"Q. Did you mail them?

"A. Not personally, but under my direction. I mean that I did not do it personally, but they were mailed by other parties.

"Q. Do you recollect this specific instance?

"A. No, sir."

To our minds this testimony affords no proof that the insured was notified as contended by the company. Further-more, the copy of the notice, the original of which the com-

pany contends was mailed to the insured, is dated March 16, 1922, just seven days after the notes in question purport to have been executed. Even if a notice had been sent at that time, it would have been of little or no service as a reminder to the insured of the due date of a note to become due nearly three months later. But, be that as it may, we agree with the Circuit Judge in his finding that the company did not notify the insured of the due date of the notes in question.

If we accept this view of the facts, that it was the custom of the insurance company to notify its policyholders of the due date of the kind of notes in question in the case at bar, that the company did not notify the insured in this case of the due date of the notes, that this failure to so notify him was the cause of his failure to make payment on the due date, and that he promptly tendered payment when he ascertained the due date of the notes, all of which clearly appears from the record, could there be a forfeiture? And ought not the insurance company have accepted payment when promptly tendered by the insured on learning the due date of the notes?

But, grant that there was a forfeiture, should not the Court of equity, clothed with its broad equitable powers, under the facts of the case, grant relief from forfeiture? As was stated in the case of *Ross Tin Mine v. Cherokee Tin Mining Co.,* 103 S. C., 248, 88 S. E., 8, while the Court of equity "will not lend its aid to a plaintiff, seeking to have a forfeiture declared or a penalty enforced," "it is a well settled principle of equity, that in proper cases it will grant relief from the forfeiture, also from a penalty."

At this juncture we call attention to the fact that the policy contract between the parties is not a contract for assurance for one year with the privilege of revival upon performing certain acts or complying with certain conditions, for instance, the payment of a certain sum of money, but that is an entire contract of assurance for

life, subject to discontinuance and forfeiture for nonpayment of premiums when they become due according to the terms of the policy. *N. Y. Life Insurance Co. v. Statham*, 93 U. S., 24, 23 L. Ed., 791. It is a condition subsequent and not a condition precedent. Therefore the Court of equity, under a proper showing, can and should grant relief against forfeiture to the party seeking such relief, requiring the payment, to the party relying upon the forfeiture, of such amount as is just and proper under the facts of the case. "Equity does not favor forfeitures or penalties and will relieve against them when practicable in the interest of justice." *Bangert v. Lumber Co.*, 169 N. C., 628, 86 S. E., 516, and cases therein cited, 2 Story, Eq., p. 644; *Carpenter v. Wilson*, 100 Md., 13, 59 A., 187; *Selden v. Camp*, 95 Va., 527, 28 S. E., 877. In 10 R. C. L., 328, the principle is stated thus:

"A familiar class of cases where Courts of equity relieve a party from the consequences of his own inadvertence to some extent, is where by the terms of his contract he is made liable at law for a penalty, or is subjected to loss in the nature of a forfeiture, owing to the nonperformance by him of certain conditions and covenants, contained therein. All such contractual arrangements are viewed by equity with extreme disfavor, so much so that not only do they receive a strict construction against those for whose benefit they are introduced, but in equity the harsh remedy of forfeiture will be forced to yield to compensation when fair dealing and good conscience seem to require it. The right in general to relieve against penalties and forfeitures is based on the ground that a party having a legal right shall not be permitted to avail himself of it for the purposes of injustice, or fraud, or oppression, or harsh or vindictive injury, and that it is wholly against conscience to say because a man has stipulated for a penalty in case of his omission to do a particular act (the real object of the parties being the performance of the act) that if he omits to do the act he shall suffer

an enormous loss wholly disproportionate to the injury to the other party."

In the discussion on this subject in 1 Pomeroy's Equity Jurisprudence, p. 864, Ind., 450, we find this statement of the rule:

"It is well settled that where the agreement secured is simply one for the payment of money, a forfeiture either of land, chattels, securities, or money, incurred by its non-performance will be set aside on behalf of the defaulting party, or relieved against in any other manner made necessary by the circumstances of the case, on payment of the debt, interest, and costs, if any have accrued, unless by his inequitable conduct he has debarred himself from the remedial right, or unless the remedy is prohibited, under the special circumstances of the case, by some other controlling doctrine of equity. * * *" "In the absence of special circumstances giving the defaulting party a higher remedial right, a Court of equity will set aside or otherwise relieve against a forfeiture, both when it is incurred on the breach of an agreement expressly and simply for the payment of money, and also on the breach of an engagement of which the obligation, although indirectly, is yet substantially a pecuniary one."

An interesting case on this subject, and in point, is the case of *Springfield & Northeastern Traction Co. v. Warrick et al.,* heard by the Supreme Court of the State of Illinois; reported in 249 Ill., 470, 94 N. E., 933, Ann. Cas., 1912-A, 187. The question involved in that case was whether or not a forfeiture resulted, and the land conveyed reverted to the grantor on account of the grantee, the Railway Traction Company, having failed to construct and put into operation a certain line of the proposed railroad by a certain date, as required by the terms of the deed. The Court held that such a provision in the deed created a condition subsequent, and that a breach of such did not entitle the grantors to a reentry on the land, under the facts in the case, and that the remedy

of the grantors was an action for damages for breach of covenants. This was the opinion of the Illinois Supreme Court notwithstanding that the deed in question in that case contained this clear provision:

"And in case said grantee shall fail to construct, build and continuously operate said proposed railway as to one track within two years from Springfield to Lincoln, or shall fail to keep and perform any of the terms and conditions imposed in this deed as therein provided, which are hereby made a part of the consideration thereof, then the strip or piece of land therein conveyed shall revert back and become the property of the grantors without the repayment of the sum of money above mentioned, which shall be retained by the grantors"

The Court took the position that the grantees had made an honest effort to comply with the conditions stipulated in the deed and were entitled to be relieved against forfeiture, giving this general statement of the rule:

"Forfeitures will be enforced by Courts in clear cases, but they are not regarded with favor, and their prevention is within the protecting care of equity whenever wrong or injustice will result from their enforcement," citing *Palmer v. Ford,* 70 Ill., 369; *Post v. Weil,* 115 N. Y., 361, 22 N. E., 145, 5 L. R. A., 422, 12 Am. St. Rep., 809; 6 Am. Eng. Enc. Law (2d Ed.), 503.

Quoting further from Pomeroy's Equity Jurisprudence, § 451, the principle is stated thus:

"There are, as intimated above, special circumstances which will entitle a defaulting party to relief against a forfeiture in cases where otherwise it would not be granted. Although the agreement is not one measurable by a pecuniary compensation, still, if the party bound by it has been prevented from an exact fulfillment, so that a forfeiture is incurred, by *unavoidable accident,* by fraud, *by surprise,* or by *ignorance,* not *willful,* a Court of equity will interpose and relieve him from the forfeiture so caused, upon his mak-

ing compensation, if necessary, or doing everything else within his power." (Italics added.) Under the editorial notes of this valuable work, this observation is made: "Many cases under this doctrine are those of covenants in leases but the doctrine, of course, extends to *all agreements.*" (Italics added.)

We may add that we know of no reason why the doctrine should not apply to a contract of insurance, such as involved in the case at bar, *under the existing facts of this* case; recognizing, of course, the fact that promptness in the payment of premiums is essential to the business of life insurance; that calculations of insurance companies are based on the hypothesis of prompt payments; and that forfeiture for nonpayment (subject to the equitable power of the Court to grant relief against forfeiture in a proper case) is a necessary means of protection. 10 R. C. L., 332; *Clifton v. Life Insurance Co.*, 168 N. C., 499, 84 S. E., 817; *New York Life Insurance Co. v. Statham,* 93 U. S., 24, 23 L. Ed., 789; *Klein v. New York Life Insurance Co.,* 104 U. S., 88, 26 L. Ed., 662. In each of these cases the Court declined to grant relief. But an examination of these cases will disclose that the facts involved therein were wholly different from the facts in the case at bar. In each of these cases the person upon whose life the insurance was issued died after default in payment of premium and before tender of payment of the premium was made. Tender of payment of premium was made by the beneficiary, after the death of the insured. In the case at bar the insured was placed in the hospital for treatment, remained there for about two months, and was discharged from the hospital on June 10th (1922), the next day after the premium note became due, in excellent condition. Arriving home the following day, in a short time, he wrote the insurance company to advise him the exact due date of the premium notes, so that he could make arrangements for payment, being under an honest belief that the notes were not due until some time in July, and asked if

payment would be required on the due date, or if he might have a little time. When the insured received a reply to his letter, telling him that the notes were due June 9th (1922), he immediately tendered payment. It is clear, therefore, that these cases are not controlling in the case at bar.

There is also the consideration already pointed out that the policy is not a contract for a single year, but an *entire* contract for insurance for life. The calculation of premiums is made on this basis. It is a matter of common knowledge, of which the Court may properly take notice, that the yearly premiums for short-term policies—even the five and ten year term policies—are much smaller than the yearly premiums on life policies. There are, therefore, certain equitable values in a life policy which belong of right to the insured, and which cannot be forfeited without rank injustice. It has been said that "insurance is a business proposition"; and that it would be inequitable conduct on the part of the insured to "default while in good health, but retain a right to pay up when bad health gives a warning." But it is only intentional or heedless default that can be said to amount to inequitable conduct, and, when under the circumstances of the particular case the good faith of the assured is apparent, and the forfeiture works a real and substantial injustice, there is in our opinion no controlling reason why a Court of equity should not interpose and exercise the power of its saving grace to relieve him from the forfeiture. The principles of equitable relief, as stated in Pomeroy (Section 451), have their logical application in cases where "a forfeiture is incurred, by unavoidable accident, by fraud, by surprise, or by ignorance, not willful."

There is also another phase of the case which we think should have a bearing on the decision—the application for reinstatement. When the insurance company notified the insured that the notes were past due, in response to his letter asking when the notes would become due, the insurance company in the same letter (dated June 27, 1922), instructed the

insured to fill out an inclosed application for reinstatement and to return the same to the company, together with check for the amount owing with interest. This application form for reinstatement also contained a proposed representation on the part of the insured, to be signed by the insured, to the effect that he was at that time in good health, and *that within the past twelve months he had not had any illness, nor consulted* nor been *treated by any physician nor been prevented by illness or accident from continuously pursuing his customary occupation.* In reply, the insured wrote the company that he .could not make this representation, and explained why he could not, informing the company of his past illness and of his treatment at the hospital by the eminent physician, Dr. Julius Friedenwald. The insured stated his rights from his viewpoint, insisted that he was not in default, and tendered to the company payment of the notes with interest, stating that, while he could not sign the representation requested for the reasons explained, he was nevertheless in good health at the time. The company refused to accept payment of the notes, and returned the remittance to the insured. In this letter, dated June 29, 1922, the company again asked the insured to make application for reinstatement, and requested or suggested that he procure a certificate from Dr. Friedenwald, giving full details of insured's illness, diagnosis and treatment prescribed and result of the treatment, and to send same to the company along with the application for reinstatement and remittance in payment of the notes and interest. The insured complied with this instruction, but wrote the company at the time that he did not waive any of his rights.

The policies contain the following provision as to reinstatement:

"At any time within five years after any default, upon written application by the insured and presentation at the Home Office of evidence of insurability satisfactory to the Company, this policy may be reinstated together with any

indebtedness in accordance with the loan provisions of the policy, upon payment of the loan interest, and of arrears of premiums with five per cent. interest thereon from their due date."

Regardless of any default on the part of the insured, if he complied with these conditions, he was entitled to be reinstated. There is no question raised as to the application having not been filed within time and at the proper place. Neither is there any contention made that the insured did not tender the necessary sum of money required under this provision. These facts are clearly established. The only remaining inquiry is, Did the insured furnish "evidence of insurability satisfactory to the Company"? In answering this question, we must look alone to the contents of the application of the insured and the certificate of Dr. Friedenwald, for it appears from the testimony in the case, and is alleged in defendant's answer, that the company reached its conclusion to refuse reinstatement on consideration of these papers alone, and that this was all the company asked of the insured before making its decision to refuse reinstatement. The principal question to be determined in considering these papers is, Has the company the right to exercise its discretion in granting or refusing the application for reinstatement, or must the papers be considered on their merit? According to our view, the provision in the policy for reinstatement is a substantial contractual right which the insured has under his policy, and that this right cannot be destroyed at the will of the company. To hold that the company could within its discretion refuse to allow a reinstatement of the policy when application is duly made would be equivalent to striking the reinstatement provision from the policy. In our opinion, the requirement of evidence "satisfactory to the Company" does not clothe the company with power to act within its discretion in passing upon the application for reinstatement but that the application, together with the supporting evidence, must be considered in the light of common sense and

reason, and not under the influence of some whimsical or fanciful idea, or arbitrarily. In passing upon this phase of the case, we must keep in mind the distinction between contracts of a personal nature and contracts of a business nature. In considering a question of this nature in the case of *Thompson v. Insurance Co.,* 63 S. C., 299, 41 S. E., 464, in which the opinion of the Court was written by Mr. Justice Gary, afterwards Chief Justice, the Court made clear the distinction of contracts of a personal nature and contracts of a business nature, such as the one involved in the case at bar; quoting from that opinion:

"When the object of a contract is to gratify taste, serve personal convenience or satisfy individual preference, the benefit which the promisee derives therefrom is of a personal nature, and his pleasure, which he has in view in entering into the contract, consists in its performance to his satisfaction. The personal character of such a contract is an element entering into it of which the promisor is bound to take notice. If the promisee was not allowed to be the sole arbiter of the one performance of the agreement in such cases, he might be compelled to accept, what in his estimation was of no value or benefit to himself and which would have deterred him from entering into the contract. In other cases the *reasonableness* of the promisee's action in determining the question is the element entering into the contract, and a *disregard* of this *element* is in the *nature* of a *fraud* on the rights of the promisor. It is *bad faith* and *unfair dealing* for a person to act *unreasonably* in an ordinary business transaction when there is nothing in the contract of a personal nature. The action of the insurance company in the case under consideration was not dependent upon taste or upon any fact of a personal nature, but solely upon the existence of a fact in an ordinary business transaction, and it would be *bad faith* for it to refuse to be governed by reason and common sense in determining the existence of such fact."

In stating these salutary principles, the Court had under consideration a question growing out of a provision in the policy that the evidence on a particular matter must be "satisfactory to the company." The question here involved in the case at bar is similar, and these principles so clearly stated in the opinion in the *Thompson case, supra,* are controlling in the case at bar. See, also, the following cases, in which the *Thompson case* was cited with approval and the principle therein stated adhered to: *Guarantee Co. v. Charles,* 92 S. C., 287, 75 S. E., 387, Ann. Cas., 1916-B 687; *Singleton v. Cuttino,* 105 S. C., 44, 89 S. E., 385; *Furman v. Tuxbury Co.,* 112 S. C., 71, 99 S. E., 111; *Levan v. Metropolitan Life Insurance Co.,* 138 S. C., 263, 136 S E., 304. In the case of *Singleton v. Cuttino, supra,* the controversy before the Court grew out of a contract to purchase if the title to the property satisfied his lawyer. The Court held that a refusal to purchase could not be sustained, unless based on reasonable grounds, and further held that, the plaintiff having tendered a good marketable title, it should have been accepted. See, also, in connection with the authorities cited herein, 37 C. J., 498.

It is thus seen that the inquiry devolved upon the Court at this juncture is, Did Mr. Lane, the insured, make 'a reasonable compliance with the requirement stipulated in the policy for reinstatement? Would men of common sense and reason be expected to reach the conclusion that Mr. Lane did make a reasonable compliance? If so, the Court should require a reinstatement of the policies.

In making application for reinstatement, Mr. Lane, the insured, followed closely the suggestions and instructions of the company. He filled out the application blank furnished him by the company, and executed the same, containing the representations as to his health as outlined by the company in letter written him by the company, and forwarded the same to the company, together with the health certificate furnished by Dr. Friedenwald. By refer-

ence to these papers, copies of which appear at the first part of this opinion, it will be observed that the application on the part of Mr. Lane shows, if his statement is true, and there is nothing in the record to the contrary, that at the time of making the application he was in good health, that during the twelve months prior thereto he had not had any illness, not consulted nor been treated by any physician, not been prevented by illness or accident from continuously pursuing his customary occupation, except that, as he explained in the statement, he was treated by Dr. Julius Friedenwald, Baltimore, Md., at Mercy Hospital, from 17th of April, 1922, until June 10, 1922, for gastric ulcer. In the certificate of Dr. Friedenwald, the doctor explained Mr. Lane's symptoms, the diagnosis made, the treatment administered, and the results obtained, stating that Mr. Lane was discharged from the hospital on June 10, 1922, "In *excellent condition*, after having taken a *thorough medical ulcer rest cure."* This certificate of the eminent physician, Dr. Friedenwald, in connection with the unqualified and unquestioned statement of Mr. Lane, as to Mr. Lane's good health, ought, it occurs to us, be sufficient in the absence of any showing to the contrary, to convince men of common sense and reason of Mr. Lane's good health, and should be *satisfactory* proof to the company, and therefore, according to our view, the company should have passed favorably on the application for reinstatement of the policy.

The defendant lays emphasis upon the fact that in a letter written to Mr. Lane the defendant offered to consider another application for reinstatement if he would have a certain other physician make an examination and pass upon his physical condition. This offer was not made until in April the following year after rejecting the application. The company having in the first instance rejected the unqualified statement of Mr. Lane that he was in good health, and also rejected the clear and full statement of the eminent physician, Dr. Friedenwald, who treated him, that he was in

"excellent condition," no doubt Mr. Lane put little faith in this offer made at that late day when the company had been informed of Mr. Lane's purpose to enter suit to establish his rights.

Taking the case as a whole, after a careful consideration of the facts from every angle, bearing in mind that the hazard of insurance risk was not increased during the period of default, and that the Courts lean against forfeitures, we are convinced that the case is one in which equity should intervene against the forfeiture declared by the company.

As to the supplemental decree of Judge Dennis, bearing date September 26, 1925, we think the same should be modified. In making payment of the premium, the insured would have the right, if he desired, to have the dividends to which he may be entitled under the terms of the policy applied toward the payment of the premium, and the same is true as to the loan value provided in the policy; furthermore, the amount of dividend and amount of loan to which the insured may be entitled being within the knowledge of the insurance company and not known to the insured, the insurance company should furnish this information to the insured, and the said supplemental decree should not operate against the rights of the plaintiffs until this information is furnished.

It is therefore the judgment of this Court that the defendant's appeal be dismissed, and the decree of Judge Dennis, bearing date September 19, 1925, in so far as his Honor adjudged and decreed the insurance policy, involved in each of the cases to be of full force and effect, and in every other respect wherein it is not inconsistent with the conclusion reached and views herein expressed, be and the same is hereby affirmed; and that the supplemental decree of Judge Dennis be modified in accordance with the views herein expressed.

MR. CHIEF JUSTICE WATTS and MR. JUSTICE STABLER and MR. ACTING ASSOCIATE JUSTICE WHITING concur.

Mr. Justice Cothran (dissenting): These two cases involve separate policies of insurance of $3,000 each, upon the life of the plaintiff Joe P. Lane. His wife, the plaintiff Mamie M. Lane, is the beneficiary in both. The action is to obtain an adjudication that the two policies which have been declared by the defendant to have lapsed by reason of the default in the payment of certain premium notes are of force.

The two cases, by agreement, were heard together by his Honor, Judge Dennis, upon testimony taken before the Master to whom the cases were referred for that purpose only. Judge Dennis filed a decree, dated September 19, 1925, ordering a reinstatement of both policies. Later he filed a supplemental decree, requiring the insured to pay all premiums unpaid, with interest from the dates of the checks tendered by him. The defendant has appealed from that portion of the decree which orders a reinstatement of both policies, and the plaintiffs have appealed from that portion requiring the payment of interest upon checks tendered and not accepted.

Each of the policies contained the following provisions which bear upon the issues involved:

"With the right on the part of the insured to change the beneficiary, in the manner provided for in Section 6." (The particulars of the exercise of such right do not concern the issues here involved.)

"The insured may, without the consent of the beneficiary, receive every benefit, exercise every right and enjoy every privilege conferred upon the insured by this policy."

(For convenience I shall confine my observations to the action on policy No. 6926303.)

The policy, dated March 9, 1921, called for an annual premium of $109.62; the first premium was due in advance, upon the delivery of the policy, March 9, 1921; the succeeding premiums were due upon the same day of the following years. The first premium was paid as required.

A few weeks before the maturity of the second annual premium, on March 9, 1922, and in anticipation of his inability to meet it, the insured wrote to the company asking that the payments of premiums be changed from annual to semiannual payments. The company acceded to his request, and on February 15, 1922, a written agreement was entered into between the insured and the company, which provided that thereafter, beginning with the date of the maturity of the second annual premium, March 9, 1922, the premiums should be paid semiannually. The first installment of the second annual premium was made payable on March 9, 1922, $57, and the second, on September 9, 1922. (Note. One-half of the annual premium of $109.62 would be $54.81; $2.19 less than $57. I assume that the discrepancy is due to an interest charge.) This arrangement was in conformity with a provision in the policy reading thus:

"The premum is always considered as payable annually in advance, but by agreement in writing, and not otherwise, may be made payable in semiannual or quarterly payments."

Before the semiannual payment under this arrangement fell due on March 9, 1922, the insured again expressed his inability to meet the obligation, at least he expressed the inconvenience that it would cause him, and wrote the company on March 4th that he wished to meet it by paying 50 per cent., $28.50, cash, and giving his note for the remainder, due 90 days from March 9th. The company did better by him than he asked; they wrote him on March 8th that they would accept $10.50 *cash* and his note for $46.50, payable June 9th, and inclosed a blank note for that amount, requesting him to sign and return it, with the required cash. Lane signed the note and returned it with cash, $10.50.

This $46.50 note, known as a "blue note," is the storm center of the controversy; it is proper, therefore, that it be set out in full. (Italics added):

"Pol. No. 6926303.                    March 9th, 1922.

"On or before June 9th, 1922, after date, without grace, *and without demand or notice,* I promise to pay to the New York Life Insurance Company Forty-six and 50/100 Dollars at S. C. Branch Office, Columbia, S. C., value received, with interest at the rate of five per cent. per annum.

"This note is accepted by said Company at the request of the maker, together with Ten and 50/100 Dollars in cash on the following express agreement: That although no part of the premium due on the 9th day of March, 1922, under Policy No. 6,926,303 issued by said Company on the life of Joe P. Lane has been paid, *the insurance thereunder shall be continued in force until midnight of the due date of said note;* that if this note is paid on or before the date it becomes due, such payment, together with said cash, will then be accepted by said company as payment of said premium, and all right under said policy shall thereupon be the same as if said premium had been paid when due; *that if this note is not paid on or before the day it becomes due, it shall thereupon automatically cease to be a claim against the maker and said Company shall retain said cash as part compensation for the rights and privileges hereby granted, and all rights under said policy shall be the same as if cash had not been paid nor this agreement made,* except only that the time within which the owner may make a choice of benefits after lapse, as provided in said policy, is hereby extended for three months after the date of this note, but no longer; that said Company has duly given every notice required by its rules or by the laws of any State in respect to said premium, and in further compensation for the rights and privileges hereby granted the maker hereof has agreed to waive, and does hereby waive, every other notice in respect to said premium or this note, it being well understood by said maker that said Company would not have accepted this agreement if any notice of any kind were required as a condition to the full enforcement of all its terms.

"$46.50                          [Name] JOE P. LANE.
                                 "[Address] Dillon, S. C."

On April 18, 1922, the insured became ill with gastric ulcer, and went to a hospital in Baltimore, where he remained until June 10th. He was then discharged, returning to his home in Dillon about the 11th, two days after the maturity of the "blue note," which was, as stated, June 9th.

On June 26th he wrote the company inquiring as to the maturity of the note which he thought was for "about $26" ($46.50 in fact). The company replied, on the 27th, that the maturity was June 9th; that it was for $46.50, and not $26.00; that it was impossible for it to be extended further; and transmitting an application for reinstatement, to be accompanied by what was termed a "self-health" certificate.

The insured, it appears, was under the impression that the "blue note" had been executed in *April*, instead of *March*, and that, running 90 days, it would mature in *July* instead of *June*.

To the company's letter of the 26th, the insured replied on the 29th, claiming that the policy had not lapsed, for the reasons that he had not been notified of the maturity of the note, and that, being disabled, the disability relieved him of the necessity of prompt payment; threatening recourse to the Court to establish his claim. With the letter he transmitted a check for $47.25, which he claimed was as much as was due on the note. He declined to sign the application for reinstatement, for the reason that he could not truthfully say that he had not been sick within the preceding 12 months.

On July 3d the company replied, claiming that the policy had lapsed for nonpayment of the "blue note," according to its terms, and returning the check for $47.25; renewing its former suggestion of an application for reinstatement; and suggesting that the insured procure from the Baltimore physician a statement giving full details of the illness of the insured, diagnosis, treatment, and result.

Complying with the last suggestion, the insured, on July 10th, transmitted the medical statement referred to, and

renewed his tender of $47.25 in payment of the "blue note"; also the signed application for reinstatement—"all of this without prejudice to my original rights."

The application for reinstatement, dated July 11th (evidently an error for July 10th), signed by the insured, *acknowledged that the policy had lapsed for nonpayment of the premium note due June 9th;* declared that the insured was then in good health, and that he had not, within the past 12 months, had any illness or consulted or been treated by any physician, from continuously pursuing his customary occupation, and that his condition was the same as it was when he applied for the policy, with the exception noted:

"Treated by Dr. Julius Friedenwald, Baltimore, Md., at Mercy Hospital from April 17th till June 10th, 1922, for gastric ulcer."

It contained also the following statement:

"If the evidence of my insurability is satisfactory to the Company and it has received in cash all sums the policy requires to be paid for re-instatement, then, and not until then, said policy shall be deemed re-instated. If said policy is not so re-instated, I agree to accept return of all sums paid in connection with this application, without interest."

The certificate of the Baltimore physician showed that the insured had been treated for gastric ulcer from April 18th to June 10th; that an X-ray examination "revealed a definite pyloric ulcer and enteroptosis"; that the patient was discharged on June 10th "in excellent condition after having taken a thorough medical ulcer rest-cure."

The application for reinstatement was referred to the medical board of the company. It was considered by Dr. North, a member of the board, who advised that it be declined. It was then referred to the classification committee, whose duty it was to pass upon applications for reinstatement after unfavorable action of the medical board. It was considered by Cooper, a member of that committee, who also advised against reinstatement. It was then referred to

Macfarlane, one of the company's actuaries, who formally and finally declined it, of which the insured was notified on August 7, 1922.

On August 15th the insured transmitted to the company a check for the total amount of the premium which was originally payable on March 9th, regardless of the agreement for semiannual payments and of the agreement resulting in the execution of the "blue note." The check was returned. On March 29, 1923, the insured repeated the tender just referred to, which was also declined on April 2d with an offer by the company to consider a reinstatement of the policy. This closed the correspondence, and war was declared by the institution of this action, at a date which does not appear in the transcript.

The basis of the decree of his Honor, Judge Dennis, appears from the following extracts:

"I am of the opinion that *the case of Brown v. Life Ins. Co., 114 S. C., 202, 103 S. E., 555 is conclusive in favor of the plaintiffs,* because the Court there held, in unmistakable terms, *that the beneficiary's rights being vested,* they could not be impaired by the forfeiture provisions of a premium note, the same being a subsequent contract to the policy, and though *the acceptance of the note constituted payment,* although the unusual right was reserved to change the beneficiary." (Italics added.)

And also:

"The provisions of the policies, 'that the insured may without the consent of the beneficiary, receive every benefit, exercise every right, and enjoy every privilege conferred upon the insured by this policy, does not militate against the conclusion above state, because the 'blue note' agreement was not a benefit, right or privilege conferred upon the insured *by the policy.*"

And also:

"I may add that the evidence shows beyond doubt that Mr. Lane acted in the utmost good faith to keep his policies

in force, and the attempt to forfeit them for a mere oversight while he was under treatment in a hospital does not appeal to a Court of Equity."

The opinion of Mr. Justice Carter makes no reference to either the first or second proposition advanced, as above stated, in the Circuit decree; and, as the opinion is indefinite as to the approval or disapproval of them, it appears to me that it is necessary that they be discussed.

As I interpret the opinion submitted, it is proposed to affirm the decree of his Honor, Judge Dennis, adjudging a reinstatement of the policy upon the grounds:

I. That there has been no forfeiture of the policy, for two reasons:

(a) The insured was entitled to prior notice of the maturity of the premium note due June 9, 1922;

(b) The insured was entitled to a reinstatement of the policy upon the ground that he had furnished to the company evidence of his insurability, which should have been acceptable to the company;

II. That conceding that the policy was forfeited by the failure of the insured to pay the premium note due June 9, 1922, *ad diem,* under the circumstances of the case, the Court, as a Court of equity, should relieve the insured from such forfeiture.

It will be observed that not one of these supporting grounds is discussed by his Honor, the Circuit Judge, except only a faint allusion to the second in the closing paragraph of the decree above quoted. It further appears that no such positions are taken in the complaint, in the evidence, in the exceptions, by motion to sustain, or in the brief of counsel. Consequently it appears mandatory to consider separately the grounds upon which the decree is based, and those upon which it is proposed that it be affirmed.

I. As to the Circuit decree:

The two main grounds upon which it is based are:

(1) That the insured had no power, by his agreement for an extension of the period within which the semiannual premium due March 9, 1922, could be paid, to bind the beneficiary to the conditions upon which that extension was secured.

(2) That the acceptance of the cash, $10.50, and the note for $46.50, due June 9, 1922, constituted a *payment* of the semiannual premium due, under the extension agreement, on March 9, 1922.

(1) As to the first ground: *That the insured had no power, by his agreement for an extension of the period within which the semiannual premium due March 9, 1922, could be paid, to bind the beneficiary to the conditions upon which that extension was secured.*

The learned Circuit Judge cites, in addition to the *Brown case,* the case of *Barron v. Bank,* 131 S. C., 441, 128 S. E., 414, as holding that the rights of a beneficiary are paramount even to an assignment made by the insured.

In reference to the cases of *Gunter v. Insurance Co.,* 130 S. C., 1, 125 S. E., 285, and *Harvey v. Ins. Co.,* 131 S. C., 405, 127 S. E., 836, he states that *"neither of them* in any way, impairs *the authority of the Brown case,* or involves the precise situation existing in the case at bar"; demonstrating beyond a doubt that the decree is based upon the principle announced in the *Brown* and *Barron cases,* that the interest of a beneficiary, even in a policy which reserves to the insured the right to change the beneficiary, *is a vested right,* which cannot be divested by the insured or the Company, or both, except in the mode provided for a change of the beneficiary.

It is due to the learned and just Circuit Judge to say that his decree was filed prior to the unanimous decision of this Court in the case of *Antley v. Ins. Co.,* 139 S. C., 23, 137 S. E., 199, which specifically overruled the *Brown* and *Barron cases,* upon which, as I have endeavored to show, the

decree was based: (It is proper to state that in the *Antley case* Mr. Justice Stabler did not participate.)

The *Antley case* was intended to set at rest the question, confused by conflicting opinions as pointed out, as to the status of the beneficiary of a life policy which contains the reservation of the right in the insured, at his pleasure, to change the beneficiary. It was there held, as was held in the case of *Bost v. Insurance Co.,* 114 S. C., 405, 103 S. E., 771, in an opinion by the present Chief Justice:

·"Under this provision [for change of beneficiary], the beneficiary does not take a vested interest, as the policy itself reserved the insured the right to change the beneficiary with the consent of the Company. Unless this right was reserved to the insured by the terms of the policy, the beneficiary would take a vested interest. By the terms of the policies the insured reserved the right to change the beneficiary, without the beneficiary's consent, and under this provision the beneficiary acquired, not a vested interest during the life of the insured, but only an expectancy. * * * Under the provisions of the policy the insured *had the right to act with the policy as he saw fit;* that he had the right to change the beneficiary without her consent and to enjoy every benefit given him under the policy."

It is stated in the *Antley case:*

"The opinion of Mr. Justice Watts in the *Bost case* makes the proper distinction and draws the correct conclusion."

It is settled, therefore, that *the interest of a beneficiary in a policy which reserves to the insured the right to change the beneficiary is not a vested interest, but only an expectancy;* and, whatever distinction may be drawn between the *Antley case* and the case at bar, that principle, the opposite of which is the basis of the Circuit Decree, is fixed. In fact, it is so conceded in the reply argument of the respondent's counsel.

I apprehend that it will be conceded that the insured had the right and power, when he realized his inability to meet the payment of the *annual* premium of $109.62 on March 9, 1922, to have the premiums changed from annual to semiannual; a change which was for the mutual benefit of the insured and the beneficiary; also the policy would in all probability have lapsed for nonpayment of the annual premium. Clearly the insured was under no obligation to obtain the consent of the beneficiary to effect this alteration in the terms of the policy.

Then, when he realized his inability to meet the *half* of the annual premium, the semiannual premium due at the same time as the annual premium had been due, March 9, 1922, for the second time he threw out a lifeline to the sinking policy, in his proposition to pay one-half of that semiannual premium and give his note for the balance. The Company, as stated, offered in reply a more favorable arrangement than the insured proposed, namely, that he pay about 20 per cent. of the semiannual premium and give his note for the balance, payable in 90 days, upon the express condition in the note, that his failure to pay the note *ad diem* would avoid all interest in the policy. This he accepted; paid the cash required; and signed the note, agreeing to the condition upon which the indulgence was secured. He certainly could not repudiate it.

The question then is, if the Company had the right to waive the punctual and full payment of the semiannual payment upon certain conditions, and if the insured had the right to and did accept the Company's proposition with its conditions, is the beneficiary bound by the conditions imposed by the Company upon this indulgence and accepted by the insured?

Considering the settled law to be that the interest of a beneficiary in a policy which reserves to the insured the right, upon compliance with certain formalities, to change the beneficiary, is not a *vested interest,* but a mere *expectancy,* I

think that it is equally well settled that, under these circumstances, the absolute dominion and control of the policy, except as to the matter of the prescribed mode of changing the beneficiary, should the insured so desire, *remains in the insured*. The only right which the beneficiary has in the policy is to receive the proceeds in the event that the insured should die while it is in force, without having exercised the reserved right of changing the beneficiary, and to insist that, if such an attempt should be made, the mode prescribed in the policy therefor should be strictly followed. In every other respect the control of the policy by the insured is absolute.

In 37 C. J., 581 (quoted with approval in the *Antley case*, 139 S. C., 23, 137 S. E., 199), it is said:

"On the other hand, where the right to change the beneficiary has been reserved in the policy so that the beneficiary does not have a vested right or interest, it is held that *insured has complete control and domination of the policy;* that his reserved right to change the beneficiary includes the lesser right partially to affect the rights of the beneficiary by assigning or creating a lien on the policy; and that he may do directly what he might do after having changed the beneficiary to himself or his estate."

In *Mutual Ben. Life Ins. Co. v. Swett* (C. C. A.), 222 F., 204, Ann. Cas., 1917-B, 298 (also similarly quoted), the Court said:

"As the policy to Swett stipulated that he might, on his written request of the company for its appropriate indorsement on the policy, change the beneficiary, his wife did not acquire a permanent or vested interest in it. The existence of such an interest during her husband's lifetime was made impossible by the control over the contract of insurance given to him, independent of her will. Her right was inchoate, a mere expectancy during his lifetime, dependent on the will and pleasure of her husband as holder of the policy, and could not vest until his death happened with the policy

unchanged. *His control over the policy was, subject to its items,* [terms?] *as complete as if he himself had been the beneficiary.*"

In *Rawls v. Insurance Co.* (C. C. A.), 253 F., 725, the Court said:

"The insured at all times prior to his death *had complete domination and control of the policies* by reason of his reserved right at any time to change the beneficiary."

In that case the syllabus is:

"Where a life policy reserved to insured right to change beneficiary, and insured, having defaulted, secured a loan on the policies to pay premiums, with the result, on the subsequent default, the automatic extended term insurance, to which the reserved was devoted, expired before the insured's death, the beneficiary cannot recover, on the theory her rights were vested, etc., for, if the insured could wholly destroy such rights by changing beneficiaries, he might do so indirectly."

In *Equitable Co. v. Stough,* 45 Ind. App., 411, 89 N. E., 612, the Court said:

"The assured had the right * * * to change the beneficiary. The beneficiary therefore had no vested right [citing cases]. *His control of the policy was complete.*"

Speaking of a policy in which the right of the insured to change the beneficiary was provided for, the Court in *Denver Life Ins. Co. v. Crane,* 19 Colo. App., 191, 73 P., 875, said:

"The policy provided, in explicit language, that the insured might, without the plaintiff's consent, * * * appoint another beneficiary in her place. She therefore had no vested interest, but only an expectancy, which might at any time be defeated by the act of her husband. *His control over the policy, subject to its terms, was as complete as if he had been himself the beneficiary,* so that his waiver of notice, * * * bound the plaintiff in the same manner

and to the same extent that it would have bound himself. * * *"

Beneficiary of life policy *is not party to contract,* and interest, where right to change beneficiary is reserved, is mere expectancy of uncompleted gift. *Mutual Ben. Life Ins. Co. v. Clark,* 81 Cal. App., 546, P., 306.

It is true that the case at bar is distinguishable from the *Antley case,* but the distinction is decidedly in favor of the position I have taken. In the *Antley case* the issue was between the beneficiary and the bank which claimed as assignee of the policy from the insured; a position not only antagonistic to the expectant interest of the beneficiary, but in that particular case *destructive of it.* In the case at bar the act of the insured was not only not antagonistic to or destructive of such expectant interest, *but actually in promotion and protection of it,* for, if the "blue note" agreement had not been entered into, the policy in all probability would have lapsed for nonpayment of the first semiannual premium on March 9, 1922; it at least eased the policy over that bump in the road, and guaranteed to the insured and to the beneficiary insurance until June 9, 1922. If, then, the *Antley case* upholds the right of the insured to assign the policy to another, a course which is destructive of the interests of the beneficiary, surely the Court in the case at bar should uphold the right of the insured to protect and continue in force the policy which was threatened with a lapse.

As is said in the case of *Rawls v. Insurance Co.* (C. C. A.), 253 F., 725, in reference to the execution of a premium note by the insured:

"Certainly she [the beneficiary], had little cause to complain *when the very purpose of the loans was to prevent the lapsing of th policies, and thus preserve her rights.*"

The real question at issue is this: Did the insured have the power to make an agreement which would, if carried out,

*save the policy for both himself and the beneficiary,* and which, if breached, would lose it for both?

That the beneficiary was benefited by the agreement, that her rights were *not divested but protected by it,* that the agreement did not work a forfeiture of the policy, is demonstrated by the fact that, although the insured had paid only 10 per cent. of the annual premium due March 9, 1922, he was insured, *for her benefit,* during the full currency of the "blue note," to June 9th; and, of course, if the policy had matured, by the death of the insured during that extended period, the full amount would have been paid to her. How this can be said to have divested her of her rights, or forfeited them under the policy, is more than I can understand.

That the expectant interest of the beneficiary, except as to the mode of changing the beneficiary, was wholly at the mercy of the insured, is demonstrated by the fact that it could be defeated *yet* by the appointment in due form of another beneficiary; or by the failure of the insured to pay the premiums; or by his assignment of the policy; or by a pledge of it for a loan; or by the acceptance of the cash surrender value.

That the insured was bound by the "blue note" agreement, I do not think that a doubt can be entertained. It has all of the elements of a valid contract—competent parties, a legal subject-matter, a valuable consideration. A decision is suggested that, although *he* may be bound, the *beneficiary* is not, and a decree for a reinstatement of the policy as to both should be sustained: The decree means this and nothing else, for, if the policy be reinstated, the rights of the insured under it, as well as those of the beneficiary, would be restored, notwithstanding the fact that he has, by his own agreement evidenced in the note, stipulated that a failure to pay the "blue note" at maturity would cause a lapse of the policy, and annihilation of his interest.

The injustice of this conclusion I think is manifest, even if the relief should be limited to the beneficiary, from this consideration: Under the reserved right to change the beneficiary, the insured could yet substitute his estate in the place of the present beneficiary, and himself receive the benefit of a policy which, due to his own default, has by agreement lapsed.

It seems entirely incongruous that the policy could be held lapsed, as it must, so far as the insured is concerned, and reinstated as to the beneficiary, with no one to respond to the obligation to pay the premiums. If avoided as to the insured, the rights of the beneficiary are gone.

"The right of the beneficiary being dependent upon the validity of the contract, any fraud, false statements, or breach of warranty, or condition rendering the policy void as to insured, will defeat it also as to the beneficiary, although he had no knowledge of the fact constituting the ground of forfeiture." 37 C. J., 525.

"A claim is made that the plaintiff in error, the beneficiary of the policy, may recover thereon, although her husband, the insured, failed to make payment of the premium. *The rights of a beneficiary are dependent upon the keeping in force of the policy under which he claims."* *Wastun v. Ins. Co.* (C. C. A.), 12 F. (2d), 422; citing 2 Joyce Ins. (2d Ed.), § 730 a; *Forbes v. Insurance Co.,* 151 Ind. 89, 51 N. E., 84; *Insurance Co. v. Roberts* (Tex. Civ. App.), 186 S. W., 411.

The note in the *Wastun case,* with the exception of a minor provision, was in the identical terms of the note in the case at bar. The facts in the two cases are as parallel as could possibly be. And would it not be a most illogical conclusion that the policy had lapsed as to the insured, by his failure to comply with the agreement, and not as to the beneficiary, who was equally benefited by such agreement, and that the policy should be reinstated in full force *as to both?*

In addition to this, I think that under the provision in the policy above quoted, "That the insured may, without the consent of the beneficiary, receive every benefit, exercise every right, and enjoy every privilege conferred upon the insured by this policy," the insured had the right, subject to the provisions as to the mode of changing the beneficiary, to treat the policy as his property, and to make any contract with it as the basis that he could have made if he or his estate had been named as the beneficiary of the policy.

The very fact that he holds a policy in the company places the insured in such relation to the company entitles him to contract in reference to the policy, in any manner not prohibited by the policy. It is not necessary that every power or right possessed by the insured, by virtue of his relation through the policy to the company, shall be enumerated in the policy. If the power to *accept* a note be implied in the company, I see no reason why the power to *give* a note for the premiums may not be implied in the insured; both owing their source to the contract relation evidenced by the policy.

Pending the exercise of that right by the insured, he may participate in the surplus dividends; he may avail himself of the loan value provisions upon a pledge of the policy; he may withdraw from the company upon acceptance of the cash surrender value of the policy; he may accept term insurance in case of a loan; he may assign the policy as collateral to a loan. All of these rights are *expressly* conferred by the policy.

The company has the right and power, implied, to accept a note for an unpaid premium upon such terms as the parties may agree upon, and will be bound by the terms of such an agreement. It could not have such power and right, for the protection of the interests of the insured, unless the insured had a corresponding power and right to assume an obligation as a consideration for the agreement by the company; a power and a right implied in the very subject of the contract.

Suppose the insured had died within the 90–day period, would the company be heard to say that it did not have the right to enter into such an agreement? Could it have set up the defense that there was no consideration supporting its obligation, for the reason that the insured was without power or right to enter into the agreement?

If it should be held that the insured had no right to enter into the "blue note" agreement, it is clear that there was no consideration for the engagement for extension on the part of the company, and the beneficiary would find herself in the situation that, as no valid contract for extension has been made, the policy has lapsed by failure to pay the annual premium, on March 9, 1922.

In *Manhattan Co. v. Wright* (C. C. A.), 126 F., 82, the Court said:

"The rules of law by which the result in this case must be determined are neither recondite nor doubtful. They are that the time of payment of a premium for insurance is, in the nature of the contract, of the essence of the agreement. A stipulation in a policy of insurance, *in a note for the premium,* or in any other instrument evidencing the contract of insurance or a part of it, to the effect that the policy or the insurance shall become void if the premium is not paid on the agreed day, is conscionable, valid, and enforceable."

(2) As to the second ground: *That the acceptance of the cash $10.50 and the note for $46.50, due June 9, 1922, constituted a payment of the semiannual premium due, under the extension agreement, on March 9, 1922.*

It seems impossible to conclude that the "blue note" was either intended or accepted as payment of the premium due March 9, 1922, in view of the express and explicit statement in the note itself:

"That although *no part of the premium* due on the 9th day of March, 1922, under Policy No. 6,926,303 issued by the Company on the life of Joe P. Lane has been paid, the insurance thereunder shall be continued in force until mid-

night of the due date of said note; that if this note is paid on or before the date it becomes due *such payment,* together with said cash, *will then be accepted by said company as payment of said premium, and all right under said policy shall thereupon be the same as if said premium had been paid when due."*

I think that the position is absolutely annihilated by the decision of this Court (unanimous it appears to have been, with the exception of Mr. Chief Justice Gary, not participating), in the case of *Gunter v. Insurance Co.,* 130 S. C., 1, 125 S. E., 285, where the Court says:

"The policy requires the payment of a premium in cash, in advance. There can be no doubt, however, of the proposition that the company may waive this requirement by accepting a premium note. There is nothing in the policy which requires the company to do so, however, and its acceptance of a premium note, in lieu of the cash, is purely a matter of convention between the insured and the company. Being a matter of convention, it plainly is subject to such terms as the parties may agree upon; that it amounts simply to an extension of the time for the payment of the premium, waiving nothing but the payment in cash, and leaving all other conditions in force, appears too plain for an argument. As a matter of fact it was accepted in response to the request of the insured for an extension. As is very clearly stated in the case of *Hipp v. Insurance Co.,* 128 Ga., 491, 57 S. E., 892, 12 L. R. A. (N. S.), 319:

" 'While the taking of the notes in lieu of a prepayment in cash waived such prepayment, or postponed the time of payment, *it did so on the terms agreed upon.* It did not operate both to waive the prepayment in cash, *and also to* waive the express * * * conditions on which the postponement of payment was agreed upon.' " (See the full authorities upon the proposition cited and quoted from in the opinion.)

In the *Gunter case* it is further said:

"In addition to the express statement in the note that non-payment of it would cause a forfeiture of the policy, the statement that the insured incurred no personal liability upon the note, incorporated in the note, is conclusive that it was not intended as payment of the premium. Would it not be remarkable to hold that a note which imposed no personal liability upon the maker was accepted as payment in full of a debt?

"It would be equally remarkable to hold that the note was accepted as payment of the premium and at the same time eviscerated the note of the most important element of it; for if the element of personal liability be eliminated, as it was by its terms, nothing is left of the note except the right to declare the policy lapsed for its nonpayment.

"It is inconceivable that the note was intended as payment of the premium, when the uncontradicted evidence shows that it was accepted by the company in response to the request of the insured for an extension of the time within which the premium might be paid."

And:

"The plaintiff would stand by the benefit secured to him and repudiate his obligation, which was the condition of that benefit."

In *Forbes v. Insurance Co.*, 151 Ind., 89, 51 N. E., 84, the syllabus is:

"On the maturity of notes given for a balance of an insurance premium, insured gave other notes in renewal, which recited that the sum therein named represented the premium on the policy, and on failure to pay them at maturity the policy was to be void. Held, that the notes were not given in payment of the premium or of the original notes."

When notes are given as a substitute for a cash payment, on a policy of insurance upon the life of a husband, for the benefit of his wife, which contains a provision policy shall become void, the nonpayment of the note forfeits the policy,

notwithstanding it is made payable to the wife, and acknowledges the receipt in cash of the amount for which the notes were given, and the wife had no knowledge of the notes and their condition. *Baker v. Ins. Co.,* 43 N. Y., 283.

"In the absence of a statute, a contract made between the insured and the insurer, providing that a policy shall cease to be in effect, if a note, which has been given for the payment of a premium on the policy, is not paid at maturity, is a valid contract, and no affirmative action by the insurer canceling the policy is necessary"—citing cases. *Wastun v. Ins. Co.* (C. C. A.), 12 F. (2d), 422.

"Although a note may be given and accepted as payment of the premium, it is not a payment when accepted conditionally. Thus the policy may provide for forfeiture upon nonpayment of the note at maturity, or within a limited time thereafter, and in case of a breach such condition controls, where it is the contract intent of the parties that it shall so operate." 3 Joyce Ins. (2d Ed.), § 1204.

In *Iowa Life Ins. Co. v. Lewis,* 187 U. S., 335, 23 S. Ct., 126, 47 L. Ed., 204, the syllabus is this:

"When the first premium on a policy of insurance is paid by note and a receipt with such an indorsement thereon is given and accepted therefor, whilst the primary condition of forfeiture for nonpayment of the annual premium is waived by the acceptance of the note, *a secondary condition thereupon comes into operation,* by which the policy will be void if the note be not paid at maturity, and no affirmative action canceling the policy is necessary on the part of the insurance company if the note be not paid when due and presented. * * * "

If the "blue note" may be considered as a payment of the premium due March 9, 1922, so far as the beneficiary is concerned, why should it not be so considered so far as the insured is concerned? As to him, clearly, it cannot be so considered, for the reason that it is expressly declared in

the note that, if it should not be paid at maturity, the policy should lapse, and the note be no longer considered as an obligation of the insured. We should have then the anomalous situation that it constituted payment as to the beneficiary, and not as to the insured.

It is everywhere recognized, as held in the *Antley case,* that, while the payment of premiums in advance, in cash, is usually required, the company may waive this requirement by accepting premium notes; its acceptance of such notes is a matter of convention between the parties; the company having the implied power to make such an agreement, by virtue of its relation through the policy contract with the insured, the insured necessarily had the reciprocal power by virtue of the same relation, to enter into such an agreement. His power and right, by convention, flow from the policy, the contract relation; they therefore may rightly be considered as "conferred by the policy," and I think come clearly within the provision.

The process of reasoning by which the result is attained that *the insured and the beneficiary* are entitled to a reinstatement of the policy appears to be this: (1) The company is bound by its agreement to extend the policy to June 9th; (2) the insured is not bound by his agreement which was the consideration for the company's agreement; (3) the beneficiary is not bound by the agreement for extension made by the insured; (4) the beneficiary is entitled to the benefit of the agreement for extension, minus the conditions upon which it was granted; (5) ergo, the insured and the beneficiary are both entitled to a reinstatement of the policy, Q. E. D.

Even when the right to change the beneficiary is *not* reserved, and the interest of the beneficiary is therefore *vested,* the policy may be avoided by some stipulated act or default of the insured. As is said in 2 Joyce, Ins. (2d Ed.), p. 1650:

"Consequently, if no such right is expressly given or reserved to him, the insured cannot defeat the rights of the first-named beneficiary by a subsequent appointment without the consent of the person first designated, *and although the contract may be annulled by the company* for sufficient cause, yet the disposal of the fund while the policy is in force, is not within the control of the assured."

"The rule stated under the preceding section as to the interest of the beneficiary under a life policy being vested, is declared to be *dependent* upon the policy being kept alive and therefore not applicable where the policy is forfeited for nonperformance of a condition upon the performance of which the life of the policy depends, as the beneficiary takes his interest in the contract strictly in accordance with its terms, and he takes only such rights and interest thereunder as said contract gives him, and the assured can no more diminish the insurer's rights or enlarge his obligations without his consent than (the insurer can) destroy the insured's rights without the latter's consent, so that the beneficiary's rights are dependent upon the performance of the conditions that the premiums shall be paid in order to keep the policy alive." 2 Joyce, Ins. (2d Ed.), § 730 a.

The circuit decree declares:

"In the *Gunter case* the policy contained the provision (not in the policies herein involved) that 'failure to pay any premium or note will forfeit the policy and all payments made thereon.' "

I think that there can be no doubt but that the *note* contains the provision for the lapse of the policy in the event of failure to pay the premium note. There does not appear to be any contest as to that proposition.

The note provides:

"That although no part of the premium due * * * under policy * * * has been paid, *the insurance thereunder shall be continued until midnight of the due date of said note.* * * * That if this note is not paid on or be-

fore the day it becomes due \* \* \* *all rights under said policy shall be the same as if cash had not been paid nor this agreement.* made, \* \* \* "

—which necessarily refers back to the conditions in the policy: "The payment of the premium shall not maintain the policy in force beyond the date when the next payment becomes due"; the payment of premiums annually during the life of the insured (changed by agreement to semiannually), and, "If any premium is not paid on or before the day it falls due, the policyholder is in default," which means clearly that the nonpayment of the premium note shall have the same effect as if the premium due March 9, 1922, had not been paid and no agreement for a "blue note" had been entered into.

The fact that the provision for a lapse of the policy may have appeared in the *policy* in the *Gunter case,* and in the *note* in the case at bar, can make no difference. See the cases quoted from at length in the *Gunter case,* sustaining the position that it is immaterial whether the provision for a lapse of the policy for default in payment of a premium note is contained in the policy, in the note, in a draft for the premium, or in a receipt for the premium.

It is unfortunate that the insured labored under the erroneous impression that the "blue note" was executed in *April* and not in *March,* and that it fell due in *July* and not in *June.* His inquiry indicated his anxiety and his appreciation of the importance of meeting it at maturity. The Company had extended to him every indulgence, even more than he asked for, and, if it should be held that it did not have the right to stand upon the conditions upon which that voluntary indulgence was granted, such conclusion would appear to me an unwarranted denial of solemn contractual rights.

"Plaintiff basing claim for recovery on life insurance policy upon insurer's acceptance of note for premium was bound by terms of note." *Diehl v. Insurance Co.,* 204 Iowa, 706, 213 N. W., 753, 53 A. L. R., 1528.

"Stipulation in premium note that policy would lapse if note was not paid on due date held valid." *Wilson v. Insurance Co.* (Mo. App.), 300 S. W., 550.

"When the note contains the forfeiting stipulation, and the policy does not, nonpayment is fatal according to *Holly v. Metropolitan Life Ins. Co.*, 105 N. Y., 437, 11 N. E., 507; *Ressler v. Fidelity Life Ins. Co.*, 110 Tenn., 411, 75 S. W., 735. See, also, *Hale v. Michigan Farmers' Mutual Ins. Co.*, 148 Mich., 453, 111 N. W., 1068; *Underwood v. Security Life and Annuity Co.*, 108 Tex., 381, 194 S. W., 585. An interesting note on this subject is in Yale Law Journal, Vol. 35, No. 2, Dec., 1925, 236." *Hayworth v. Insurance Co.*, 190 N. C., 757, 130 S. E., 612.

"Where a premium is not paid within the time stipulated in the policy, and where within the grace period an extension agreement is entered into, evidenced by a note and a conditional receipt, the provisions of such note and conditional receipt with reference to termination of the policy upon nonpayment are controlling." *Kroksather v. Insurance Co.*, 49 N. D., 619, 193 N. W., 48.

"The provision of a note for premiums given by the holder of a life insurance policy that the policy should forfeit upon nonpayment of the note held valid." *Home Life & Accident Co. v. Haskins,* 156 Ark., 77, 245 S. W., 181.

"Where a note accepted by the Company as the balance on a life insurance premium recited that it was so accepted on the express agreement that if it was not paid on the due date the Company could retain the cash already paid as compensation for having continued the insurance, the policyholder is bound by the contract which he made by signing the note, and his beneficiary cannot claim that the cash payments already received should be considered as a part payment on the annual premium or applied as a quarterly or semiannual payment to extend the life of the policy, when such contentions were contrary to the provision of the policy

as well as of the note." *Robnett v. Insurance Co.,* 148 Ark., 199, 230 S. W., 257.

Where insured gave notes for premium providing that insurance should terminate if they were unpaid when due, though insurer retained notes unpaid after maturity, the insurance lapsed. *Dunn v. Insurance Co.,* 18 Ga. App., 383, 89 S. E., 432.

When a life policy would have been forfeited for nonpayment of premium, subject to a right which would have kept it in force for a time, insured paid the company $31.25, and gave it his note, due in eight months, providing that the insurance should be continued in force till the due date of the note; that, if then paid, such payment, with the $31.25, would be accepted as payment of the premiums, and all rights should continue as though the premium had been paid when due; and that, if the note was not then paid, all rights against the company should be the same as though the cash had not been paid and the agreement in the note had not been made. Held that the policy ceased to be in effect except as continued in the provision in the note. *White v. Insurance Co.,* 200 Mass., 510, 86 N. E., 928.

"The failure of an insured to pay at maturity a note given for a premium due on a policy of insurance is a complete defence as to liability for loss of property insured during default, where it is provided that the policy, because of nonpayment of such note, shall lapse and be of no force and effect unless the conditions are waived by the insurer." *Antes v. Insurance Co.,* 61 Neb., 55, 84 N. W., 412.

"Where extended time for payment of an insurance premium is granted for a note given, a stipulation that if the note given for the premium is not paid at maturity the policy, including all conditions for surrender or continuance as a paid-up term policy, should be null and void, is one that will be sustained by the Courts." *Seeley v. Insurance Co.,* 10 Pa. Super. Ct., 270.

"On the maturity of notes given for a balance of an insurance premium, insured gave other notes in renewal, which recited that the sum therein named represented the premium on the policy, and on failure to pay them at maturity the policy was to be void." Held that the notes were not a payment of the premium or of the general notes until paid, and that policy was forfeited on their non-payment. *Forbes v. Insurance Co.,* 151 Ind., 89, 51 N. E., 84.

II. As to the opinion of Justice Carter: Repeating for convenient reference the analysis of the opinion above set forth, it is proposed to affirm the Circuit decree upon the grounds:

I. That there has been no forfeiture of the policy, for two reasons:

(a) The insured was entitled to prior notice of the maturity of the premium note due June 9, 1922.

(b) The insured was entitled to a reinstatement of the policy, upon the ground that he had furnished to the company evidence of his insurability which should have been acceptable to the company.

II. That, conceding that the policy was forfeited by the failure of the insured to pay the premium note due June 9, 1922, *ad diem,* under the circumstances of the case, the Court, as a Court of equity, should relieve the insured from such forfeiture.

*As to the proposition that there has been no forfeiture of the policy for the reason that the insured was entitled to prior notice of the maturity of the premium note due June 9, 1922:*

In view of the positive and explicit terms of the contract for extension of the premium due March 9, 1922, I cannot understand how it can be contended that the insured was entitled to such notice. The note of March 9, 1922, which is the evidence of that contract, provides:

"On or before June 9, 1922, after date, *without grace and without demand or notice,* I promise to pay————. This

note is accepted by said Company * * * on the following express agreement: That * * * the insurance thereunder shall be continued in force *until midnight of the due date of said note.* * * * That if this note is not paid on or before the day it becomes due * * * all rights under said policy shall be the same as if cash had not been paid nor this agreement made. * * * That said Company has duly given every notice required by its rules or by the laws of any State in respect to said premium, and in further compensation for the rights and privileges hereby granted the maker hereof has agreed to waive, and does hereby waive, every other notice in respect to said premium or this note, it being well understood by said maker that said Company would not have accepted this agreement if any notice of any kind were required as a condition to the full enforcement of all its terms."

I know of no law which requires the payee of a note to give the maker notice beforehand of its maturity; there is nothing in the policy or in the note, in the case at bar, which requires it; in fact, the stipulation is specific in the note that demand and notice are waived. If, notwithstanding this conventional immunity from the obligation to give notice, the company has continuously given it to the insured, and he has acted upon that custom, with the knowledge of the company, there might be ground for insisting upon an estoppel (*Knoebel v. Insurance Co.,* 135 Wis., 424, 115 N. W., 1094, 20 L. R. A. [N. S.], 1037), and note; but in the case at bar no such conditions are presented. There is no evidence that any other note had ever been given by the insured, or that he had acted upon an alleged custom of the company to extend such notice to others. In fact, the insured assumed the duty upon his own accord to inquire as to the maturity of the note. It does not even appear that the insured was aware of any such custom, and it appears illogical to claim the benefit of a custom which he knew nothing of.

*As to the proposition that there has been no forfeiture of the policy for the reason that the insured was entitled to a*

*reinstatement of the policy, upon the ground that he had furnished to the company evidence of his insurability which should have been acceptable to the company:*

There is nothing in the complaint which indicates an intention to insist upon the right of reinstatement of the policy. The contention is, that it has never been forfeited. Of course, there can be no reinstatement except after a lapse or forfeiture of the policy. No such right was considered by the Circuit Judge, and I find in the brief of counsel for the respondent not a suggestion of it.

The unfairness to the company in sustaining the decree upon such a ground under such circumstances is apparent when it is considered that it has had no opportunity of meeting the position with either evidence or argument. It might be shown, as doubtless was the fact, that the condition of the insured had existed for some time; that he had consulted and been treated by a physician for awhile before he went to Baltimore; and that his condition after he returned was such as to justify the conclusion by the company as to his insurability.

But, aside from this, and considering that the claim for a reinstatement is properly before the Court, what do we find?

The policy provides:

"At any time within five years after any default, upon written application by the Insured and upon presentation at the Home Office of evidence of insurability satisfactory to the Company, this Policy may be reinstated together with any indebtedness in accordance with the loan provisions of the Policy, upon payment of loan interest, and of arrears of premiums with five per cent. interest thereon from their due date."

The insured has by contract agreed to submit to the home office evidence of his insurability "satisfactory to the company," as a condition of reinstatement.

I do not think that any one could deny the justness of the principle announced by this Court in the case of *Thompson v. Insurance Co.*, 63 S. C., 290, 41 S. E., 464, and so clearly stated by the late Chief Justice (Gary) :

"It is bad faith and unfair dealing for a person to act unreasonably in an ordinary business transaction when there is nothing in the contract of a personal nature. The action of the insurance company in the case under consideration was not dependent upon taste or upon any fact of a personal nature, but solely upon the existence of a fact in an ordinary business transaction, and it would be bad faith for it to refuse to be governed by reason and common sense in determining the existence of such fact." See *Thompson v. Insurance Co.*, 226 N. Y., 363, 123 N. E., 750; *Hinchcliffe v. Minnesota Commercial Men's Ass'n*, 142 Minn., 204, 171 N. W., 776.

The right of reinstatement, in the case at bar, was a right secured by contract, the policy of insurance, upon certain conditions. The provision in the policy appears upon its face to lodge the arbitrary power with the officers of the company to decide whether the applicant for reinstatement was, on the day the application dated July 11, 1922, reached the company, an insurable risk. But, notwithstanding, the case falls under the well-established rule, that in ordinary business transactions, not involving matters of personal taste and convenience, neither party has the arbitrary right to decide the existence of a particular fact upon which his obligation under the contract depends. The parties may contract to leave the decision of that issue to one or the other, but the law requires that in that decision the party who is vested with the power of decision shall act fairly, honestly, and reasonably, in view of all the circumstances, and that the other party shall not be bound by that decision when it is shown that it has been exercised arbitrarily, capriciously, and unreasonably.

The parties, however, by contract, having committed to the officers of the company the power to decide this particular issue of fact, *prima facie* their decision must be deemed to have been a just one; the presumption is that it was the result of the exercise of a fair, honest, and reasonable judgment; and the burden upon the applicant, attacking that decision, was to show the contrary.

In the opinion of Justice Woods, in the case of *Guarantee Co. v. Charles,* 92 S. C., 288, 75 S. E., 387, Ann. Cas., 1916–B, 687, occurs this statement:

"It is an attempt to make one of the parties the final judge in his own case, of a matter of ordinary business accounting as distinguished from matters of personal fancy, taste, convenience, or preference. At the most such a stipulation cannot be effective further than to make the conclusion of the party in whose favor it is made *prima facie* evidence of the fact of default."

If this be true (and it is the opinion of the majority of the Court participating in the decision), the declination of the application for reinstatement upon the ground that the applicant had not submitted evidence of his insurability, in the opinion of the home office, must be taken as *prima facie* to have been the result of an honest investigation and decision. The applicant agreed to submit the determination of this question to the officers of the company. They have acted, not by a single officer, but separately by four; if the applicant would override that decision, the burden is upon him to show that the decision was so unreasonable as to amount to a fraud. As it is declared in the *Thompson case:*

"The reasonableness of the promisee's action in determining the question, is the element entering into the contract, and a disregard of this element is in the nature of a fraud on the rights of the promisor."

In the case of *Lane v. Insurance Co.,* 142 N. C., 55, 54 S. E., 854, 115 Am. St. Rep., 729, which was a case of reinstatement under a policy provision which required the as-

surance of good health to be approved by the medical director and president of the company, the application was rejected.

The Court said:

"In the absence, certainly, of any showing that the approval of the officers has been fraudulently withheld and that their denial of the application is purely arbitrary, we do not see why their refusal to reinstate the plaintiff is not fatal to his right of recovery in this action."

The Court further said:

"Where there is no suggestion of fraud or other legal wrong, there can be no valid reason why the applicant should be permitted to attack the soundness of their judgment or the justness of their conclusion. We must hold it to be right, and unassailable in any such manner, because the parties have solemnly agreed that the matter shall be decided in that way, and we have no power to change their contract; and besides, the power lodged with those officers is consistent with the purposes of the organization, and its exercise is necessary for the protection of the rights of other members and is not otherwise at all inconsistent with reason and justice."

In *Brun v. Council,* 15 Colo. App., 538, 63 P., 796, the Court said:

"When a party has failed to comply with his contract, and relies upon the performance of a condition subsequent, whereby his right, under the terms of the agreement, is to be revived, he must undoubtedly both allege and prove the performance of the condition or the happening of the event, either one or the other of which revives his right, and establishes the obligation of the other party."

If this had been, as clearly it is not, an action to enforce a reinstatement of the policy, there can be no doubt but that the complaint should have alleged a default on the part of the insured within five years, and the facts upon which the claim for reinstatement depended—that the insured had submitted to the home office evidence of his insurability satis-

factory to the company at that time. It is a proper concession to him that his proof will be sufficient if he shows that the declination was arbitrary, capricious, and unreasonable. Clearly, then, the burden of showing this was upon the applicant.

In the opinion of Mr. Justice Carter it is said:

"It is thus seen that the inquiry devolved upon the Court at this juncture is, did Mr. Lane the insured make a reasonable compliance with the requirement stipulated in the policy for re-instatement? Would men of common sense and reason be expected to reach the conclusion that Mr. Lane did make a reasonable compliance? If so, the Court should require a re-instatement of the policies."

I think that the learned Justice is mistaken in his conception of the issue in the case. His position is that the whole matter depends upon the question whether or not Mr. Lane was an insurable risk on the date of the application. That is not the controlling issue, as I understand it.. The matter by contract having been left to the decision of the officers of the Company, the issue is, not whether as a matter of fact Mr. Lane was at that time an insurable risk, but whether the officers to whom the decision of that question was committed exercised the power conferred upon them fairly and honestly, or so arbitrarily, capriciously, and unreasonably as to amount to a legal fraud upon the rights of the applicant.

I do not think that there is a particle of evidence tending to show that the declination of the application was arbitrary, capricious, and so unreasonable as to constitute a fraud upon the applicant. In the first place, an insurance company is in the business to insure, not to decline, applications, and the presumption is in their favor that, if the risk is an insurable one, it will be accepted. As soon as the application was received, it was referred to the medical board, and from it to three of the officers of the Company who in separate reports recommend a declination. They had before them the letter of the Baltimore physician that the applicant

had been treated for two months for a gastric ulcer; that the X-ray examination showed a pyloric ulcer, that is, an ulcer at the pylorus, the valve opening from the stomach into the intestines, accompanied by enteroptosis, "an abnormal sinking downward and forward of the abdominal viscera." They may have differed with the eminent Baltimore physician in his statement that the applicant left the hospital in "excellent condition." At any rate, they were under no obligation, so long as they exercised an honest judgment of their own, to accept his statement. As a matter of fact, the applicant was confined to his bed for hours a day, according to his testimony, and for weeks after he returned home; a result of his disease hardly compatible with good health, "excellent condition," and a physical status the same as when he applied for a policy more than a year before.

The seriousness, due to effects and possible complications, of an ulcer of the stomach, which are explained in the medical works of Dr. Elsner, professor of medicine in the college of medicine, of Syracuse University, may well give the officers of an insurance company pause in accepting an applicant for original insurance, or an applicant for the reinstatement of a lapsed policy. (So far as the *fact* of insurability is concerned, they are on precisely the same basis.) In his Monographic Medicine, Vol. 6, beginning at page 585, he says that a fatal hemorrhage, even from a small ulcer, is possible; that *"freedom from symptoms during long periods, does not by any means signify cured or healed ulcer";* that among the leading complications and dangers are a perforation of the wall of the stomach, causing peritonitis or blood poisoning; hemorrhage; degenerative changes leading to cancer of the stomach, *"ulcer of the stomach is a positive factor in the production of cancer";* adhesions in 40 per cent. of ulcers; anemia and consequent exhaustion; swellings; lockjaw, and acidosis. Some of these results are not considered by him as highly *probable,* but all *possible.* With a caged beast of this ferocity, would the officers of

the Company be just to the stockholders in opening the door of the cage? Can their declination, with this light before them, be held by this Court to have been arbitrary, capricious, and unreasonable? I do not think so; they would have been remiss to a degree in their duty if they had done otherwise.

Suppose Mr. Lane had never taken out any insurance, and upon an original application it developed that he had been such a sufferer from ulcer of the stomach as, upon the advice, which may be assumed, of his family physician and as a *dernier resort,* to require the attention of a distinguished specialist in Baltimore; had been treated there for two months; had returned home, and for three weeks could not attend to his regular business; with all the possible complications that might result—can it be considered for a moment that he would have been accepted by any company as an insurable risk?

It seems to me that the charge that an insurance company, whose business it is to insure people, to make money out of the premiums collected, would arbitrarily, capriciously, and unreasonably turn down an application of a perfectly insurable risk is itself unfounded and unreasonable.

*As to the proposition that, conceding that the policy was forfeited by the failure of the insured to pay the premium note due June 9, 1922, ad diem, under the circumstances of the case, the Court, as a Court of equity, should relieve the insured from such forfeiture:*

The same observation is applicable to this proposition as to the preceding one: There is nothing in the complaint which indicates an intention to insist upon the right of relief from the forfeiture. The contention is that the policy has never been forfeited. Of course, there can be no relief from a forfeiture, if none ever existed. It was not considered by the Circuit Judge, and I find in the brief of counsel for the respondent not a suggestion of it.

If this proposition should be sustained by the Court, insurance companies may as well "fold their tents like the

Arab" and depart. That, notwithstanding the most specific and explicit condition requiring the payment of a premium upon the due date, and providing for a lapse of the policy in case of default, "upon the broad principles of equity," the Court may, upon proof of sickness in a hospital, forgetfulness, negligence, ability and willingness to "carry on," make a new contract for the parties by expunging that portion of it, is a new and startling proposition to me.

The general rule of relief from penalties and forfeitures in equity is thus expressed in 10 R. C. L., 328 (it appears just as reasonable) :

" * * * In equity the harsh remedy or forfeiture will be forced to yield to compensation when fair dealing and good conscience seem to require it. The right in general to relieve against penalties and forfeitures is based upon the ground that a party having a legal right shall not be permitted to avail himself of it or harsh purposes of injustice or fraud or oppression or harsh vindictive injury, and that it is wholly against conscience to say because a man has stipulated for a penalty any acts or his omission to do a particular act (the real object of the parties being the performance of the act) that if he omits to do the act he shall suffer an enormous loss wholly disproportionate to the injury to the other party."

At page 332 it is said:

"Likewise promptness in the payment of premiums is essential to the business of life insurance. Calculations of insurance companies are based on the hypothesis of prompt payments. Forfeiture for nonpayment is a necessary means of protection from embarrassment. Therefore, if a life insurance policy is conditioned to be void for the failure to meet premiums when due equity cannot relieve against a forfeiture occasioned by the neglect of the insured to perform this condition."

In the case of *N. Y. Life Ins. Co. v. Statham,* 93 U. S., 24, 23 L. Ed., 791, the claim was that the Court should re-

lieve the insured from a forfeiture of the policy by reason
of default in the payment of an annual premium, the default
being due to the existence of a state of war between the
states. The Court denied the relief, saying:

"But whilst this is true, it must be conceded that prompt-
ness of payment is essential·in the business of life insurance.
All the calculations of the insurance company are based on
the hypothesis of prompt payments. They not only calcu-
late on the receipt of the premiums when due, but on com-
pounding interest upon them. It is on this basis that they
are enabled to offer assurance at the favorable rates they do.
Forfeiture for nonpayment is a necessary means of protect-
ing themselves from embarrassment. Unless it were en-
forceable, the business would be thrown into utter confu-
sion."

The Court further states:

"The case, therefore, is one in which time is material and
of the essence of the contract. Nonpayment at the day in-
volves absolute forfeiture, if such be the terms of the con-
tract, as is the case here. Courts cannot with safety vary
the stipulation of the parties by introducing equities for the
relief of the insured against their own negligence."

In *Nederland Ins. Co. v. Meinert,* 199 U. S., 171, 26 S.
Ct., 15, 50 L. Ed., 139, the Court said:

"A statute of this kind should not be construed so as to
make it a trap for either side. Forfeitures, though gener-
ally not regarded with favor by Courts of equity, yet are
necessary, and should be fairly enforced, in cases of life
insurance. Promptness of payment is essential in such bus-
iness"—citing *N. Y. Life Ins. Co. v. Statham,* 93 U. S.,
24, 23 L. Ed., 791.

In·*Iowa Life Ins. Co. v. Lewis,* 187 U. S., 335, 23 S. Ct.,
126, 47 L. Ed., 204, the Court said:

"The decisions of this Court, however, support the con-
tention of plaintiff in error [the company, that the policy
determined at the occurrence of the maturity of the pre-

mium, without payment, and that no affirmative action on the part of the company was required]. In *New York Life Insurance Company v. Statham et al.,* 93 U. S., 24 [23 L. Ed., 791], Mr. Justice Bradley, delivering the opinion of the Court, said: 'Promptness of payment is essential in the business of life insurance. * * * Delinquency cannot be tolerated nor redeemed, except at the option of the company. * * * Time is material and of the essence of the contract. Nonpayment at the day involves absolute forfeiture, if such be the terms of the contract. * * * Courts cannot with safety vary the stipulation of the parties by introducing equities for the relief of the insured against their own negligence.' The intervention of war was held not to avoid a forfeiture. This case was quoted and its doctrine announced again in *Klein v. Insurance Co.,* 104 U. S., 88 [26 L. Ed., 662], and again in *Thompson v. Insurance Co.,* 104 U. S., 252 [26 L. Ed., 765]. In *Klein v. Insurance Co.* it was said: 'If the assured can neglect payment at maturity and yet suffer no loss or forfeiture, premiums will not be punctually paid. The companies must have some efficient means of enforcing punctuality. Hence their contracts usually provide for the forfeiture of the policy upon default of prompt payment of the premiums. If they are not allowed to enforce this forfeiture they are deprived of the means which they have reserved by their contract of compelling the parties insured to meet their engagements. The provision, therefore, for the release of the Company from liability on the failure of the insured to pay the premiums when due is of the very essence and substance of the contract of life insurance. To hold the Company to its promise to pay the insurance, notwithstanding the default of the assured in making punctual payment of the premiums, is to destroy the very substance of the contract.' "

In 2 Joyce, Ins. (2d Ed.) § 1104, it is said:

"In case the premium is not paid when due, in consequence of which a forfeiture is incurred under the conditions of the contract, equity will not grant relief."

In *Donald v. Insurance Co.,* 4 S. C., 321, the Court said:
"That the policy was void for nonpayment of the premium according to its terms, and consequently that the plaintiffs had no cause of action" and that "the conditions of a policy of insurance as to payments of annual premiums must be strictly complied with by the insured, or his policy will be void."

In *Perkins v. Insurance Co.,* 93 S. C., 88, 76 S. E., 29, the Court said:
"The policy itself provides by its own terms that it shall lapse for nonpayment of premiums one month after January 1, 1911. Hence, it was a dead contract and not a live one after February 1, 1911. This becomes obvious if we ask the question. If not on February 1, 1911, then on what subsequent date can the policy be regarded as dead for nonpayment of premium? The policy itself contains no provision within itself whereby its life can be prolonged unless the company by virtue of a new agreement, understanding, or contract agrees to reinstate it. * * * If the policy was not dead on February 1, 1911, then on what future date did it or could it become so? No means exist fixing such a date. Suppose insured had neglected to pay the premiums for six months after February 1, 1911, who would contend that the policy would have survived until August 1, 1911? Yet every reason for declaring it dead on August 1, 1911, applies with equal force to February 1, 1911."

In *Parry v. Insurance Co.,* 95 S. C., 1, 78 S. E., 441, the Court assumed without question that the policy had lapsed for nonpayment of the premium due. No suggestion appears that the Court could relieve from such forfeiture.

In 2 Joyce, Ins. (2d Ed.), § 1103, it is said:
"If the policy provides that the premiums shall be paid on or before a stipulated day or the policy shall become forfeited and void, or that the Company shall be released from all liability, time becomes of the very essence of the contract, and a failure to pay as agreed determines the contract,

unless there be a waiver or estoppel"—citing an array of cases.

The theory of relief in equity from a forfeiture or penalty, generally, is that the party claiming a forfeiture may be compensated in money for the breach—it is usually limited to contracts involving the payment of money, and is awarded in the interest of justice. How the cause of justice is advanced by denying to one the benefit of a specific and explicit contract, not involving the payment of money, I cannot see.

I agree with the statement in the opinion that, in the event of reinstatement, the insured should be allowed credit for the dividends in the meantime declared; but I do not see how he could be allowed credit for the *loan value* of the policy. If the policy should be reinstated, it would be reinstated with all of its original provisions, one of which is the benefit of the loan value which he could take advantage of or not as he might choose.