CROWN CENTRAL PETROLEUM COR-
PORATION, Appellant,

v.

PORT OIL CO. (Formerly Hewitt Oil
Marketing Co.), Appellee.

No. 8424.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 13, 1961.

Decided March 22, 1962.

John S. McDaniel, Jr., Baltimore, Md.
(Cable & McDaniel, Baltimore, Md., Buist
& Buist, George L. Buist and Henry B.
Smythe, Charleston, S. C., on brief), for
appellant.

G. L. B. Rivers, Charleston, S. C.
(Hagood, Rivers & Young, Charleston,
S. C., on brief), for appellee.

Before SOPER, BOREMAN and
BRYAN, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge.

This is a contract controversy between Crown Central Petroleum Corporation, a supplier of petroleum products, and Port Oil Company, its South Carolina distributor.

In this relationship Crown from time to time took from Port seventeen *leases* for filling station sites and immediately executed *lease-backs* to Port. Port assigned the rent payable by Crown under each lease to Charleston banks to secure their loans to Port for erection of the stations. Crown thereupon accepted the assignment. Additionally, by a *distributor agreement* Port promised for a fixed period to buy its petroleum requirements from Crown exclusively. In *special agreements* Crown reserved the power to terminate the lease-backs (from it to Port) upon abrogation by Port of the distributor agreement. Underlying the supplier-dealer relation was what the parties called a *"through-put" agreement* in which Port guaranteed to purchase each year a minimum of Crown products through a designated terminal at Charleston.

The distributor and through-put agreements were renounced by Port, allegedly for initial defaults by Crown and also for illegality of the distributor agreement. Crown sued to recover possession of the stations in specific performance of the special agreements. Further, it asked damages for breach of the through-put's guarantee. Port resisted repossession and additionally sought cancellation of the leases and lease-backs. The District Court refused Crown relief but granted all of Port's prayers.

The Court took the ground that: (1) Crown had defaulted in an oral agreement to continue the lease and lease-back arrangement up to at least 40 stations, which justified Port's renunciation of the distributor agreement and precluded Crown's repossession of the stations; (2) the leases, lease-backs, special agreements and distributor agreement together comprised in effect mortgages of the stations, and Port's tender of payment of the construction loans defeated Crown's

right to recapture the stations and entitled Port to a cancellation of the leases and lease-backs; and (3) the antitrust statutes, 15 U.S.C.A. § 1 et seq. rendered the distributor contract unenforceable. Damages for violation of the through-put agreement were not granted, the Court finding that Crown had refused to sell to Port thereunder when requested.

Crown appeals. The facts are not in substantial dispute except in regard to the oral agreement for 40 stations. The instant contractual rights and obligations under the arrangement with Crown became Port's as a successor and assignee; but since the history of their acquisition and assumption does not affect decision of the issues here, "Port" designates the present Company and its assignor and predecessor as well.

*Through-put Agreement*—In 1952 or earlier Crown began to bring bulk petroleum into Charleston by tanker. There it was placed in a terminal under an agreement with the depot owner. The through-put agreement between Crown and Port was incident to this "terminaling", which was advantageous to both. The agreement assured Crown of Port's assistance in maintaining the facilities. The latest through-put agreement, dated August 5, 1954, is concurrent with the distributor agreement. For failure in any year to purchase the minimum quantity therein stipulated, the through-put agreement required Port to pay Crown 7.5 cents per barrel for the deficiency. This obligation was "absolute and unconditional and without regard to whether any such deficiency resulted from a cause or causes beyond the control of [Port], including but not by way of limitation, the ability of Crown and [Port] to agree on the price or any other terms and conditions for the sale of Crown's products to [Port]".

*Distributor Agreement*—To assure distribution of its products throughout the Charleston and coastal areas of eighteen specified counties, Crown entered into recurrent distributor agreements with Port. In the latest, dated August 5, 1954, Port covenants to buy from Crown Port's "entire requirements [of petroleum prod-

ucts] during the term of this agreement * * * for the purpose of sale and delivery by [Port]" at the designated points throughout the area. The vendee further covenants that "its requirements during the term of this Agreement will be nothing but the products of [Crown]", and that its annual requirements would be between the minimum and maximum listed in the agreement.

The agreement further set forth that gallonage required above the stipulated minimum would be bought from Crown. If a quantity greater than the stated maximum was needed, the purchaser would give Crown the option to furnish the additional amounts. The original term stipulated was from June 1, 1954 to December 31, 1959. Automatic successive renewals for five years each were permissible, subject to the right of either party on notice to terminate the agreement at expiration of the initial or a subsequent term.

For default of purchaser Port to "order or accept or pay for products in accordance with the terms" of the distributor agreement or of "any failure by Purchaser to keep and perform the terms and conditions of the Agreement", Crown could at its discretion after sixty days either rescind the whole agreement and recover the liquidated damages provided therein, or recover from the purchaser the price of products not taken, reserving the quantity under lien until payment should be made.

*Lease and Lease-Back*—As early as 1953 and regularly thereafter Port in collaboration with Crown had been constructing filling stations for the sale of Crown motor vehicle items. The procedure in each instance was the same. A site satisfactory to both would be purchased or leased by Port. Thereupon the site would be leased to Crown for 10 years. Crown had meanwhile obtained substantial credit with two Charleston banks, so that Port—in borrowing from the bank to put up the station—was enabled to persuade the banks to accept Crown's lease obligations as security for the loan. The banks would credit the

monthly rentals to the satisfaction of the loan. These payments would retire the loan at or before the expiration of the lease.

The property was leased back to Port for a rent generally less than that reserved under the primary lease. The disparity in rental was in effect a subsidy to Port which under the arrangement must build a Crown-type installation, a more expensive undertaking than an unbranded station.

*"Special" Agreements*—In conjunction with each station, another agreement was signed by the same two parties. Referred to as a "special" agreement, it bridged the distributor agreement to each lease-back. Briefly reciting the arrangement sketched *ante*, the "special" provided that the lease-back from Crown to Port should be terminated "in the event that such Distributor Agreement shall be cancelled by [Port] at any time before the expiration of the term of such Lease by [Port] to Crown or in the event that any time prior to the expiration of the term of such Lease from [Port] to Crown [Port] shall stop purchasing from Crown under such Distributor Agreement otherwise than as a result of the cancellation of such Distributor Agreement by Crown for a reason other than a default by [Port]". This understanding entered into the construction of each of the seventeen stations.

*Oral Agreement*—Port asserted in the trial court that Crown in January 1954 had promised there should be at least 40 stations constructed under arrangements identical with the erections of the 17. This engagement, as Port owns, was never in any manner memorialed. Crown denies it ever existed. Its "breach" by Crown, in any event provoked the present litigation.

Decline of the entire relationship began in 1955. Crown's representative advised Port that his company would not assist Port in future financing of stations unless Port would, after the 10-year terms, allow two successive renewal options of five years each. Unwilling to lease any station to Crown beyond the

period required to pay for it, Port on October 29, 1956 wrote Crown it was cancelling the distributor agreement for Crown's refusal to continue the old service-station formula. In this notice Port observed it would still buy Crown products under the through-put agreement, and the notification was repeated in a second letter, dated December 26, 1956.

On March 13, 1959 by letter, Port informed Crown of its cancellation of the through-put agreement. The justification claimed was the refusal of Crown to sell kerosene to Port on January 10, 1957 and February 20, 1958. By letter dated October 28, 1958 Crown had advised Port that Port's repudiation of the distributor agreement had put an end to it, and in accordance with the terms of the special agreements Crown declared 16 * of the station lease-backs terminated.

■ I. Port's basic defense to Crown's demand for return of the stations—that Crown violated the 40-station oral agreement and thus justified Port in abandoning the distributor agreement—cannot stand. For this conclusion it is not necessary to consider Crown's objection that the distributor agreement could not be varied by proof of an oral agreement. Our view rests entirely upon lack of substantiation of the oral agreement.

The evidence does not specify the terms of the purported agreement with contract definiteness. Particularly, locations of future stations are left to subsequent judgment; the number of stations is not finally settled, nor is their size, date of construction or expense. The testimony is vague, the terms more so. We cannot accept the District Judge's finding that there was in fact a contract. However, the evidence adduced on this phase of the case may be considered to the extent it is enlightening in other aspects of the controversy.

II. The lease and lease-back arrangement for financing the stations—separately or under a plan for 40—was not a mortgage. Ascribing a mortgage ef-

fect to it, Port has shown a willingness and ability to pay all the building loans. This, argues Port, under the present provocation redeems the stations from foreclosure-repossession and cancels the leases and lease-backs since they are but constituents of the "mortgage". The District Judge thought so too.

■ But Port owed Crown nothing in money under the arrangement save lease-back rent, for Crown was not endorser of Port's bank loans. Crown assumed no responsibility of any kind in personam save the obligations of its leases. It pointedly refrained from promising payment beyond its obligation to honor the assignment to the bank of the rents it owed under the lease. So, the only mortgage or pledge relation was that between Port and the banks. Therefore, we cannot sustain the District Court in cancelling the leases and lease-backs and denying enforcement of the special agreements upon the theory that together they were the equivalent of mortgages.

■ Never squarely before the Court was the question whether the special agreement provided a forfeiture of the lease-back. We do not mean to declare it did, but it is now a worthwhile inquiry. Forfeiture is ever suspect in equity. Galvin v. Southern Hotel Corp., 154 F.2d 970, 973, (4 Cir. 1946); Wolfe v. Herlihy, 218 S.C. 90, 61 S.E.2d 764, 770 (1950). Equity will strain to avoid its harshness. Lane v. New York Life Ins. Co., 147 S.C. 333, 145 S.E. 196, 209 (1928). Judge Soper in the Galvin case, supra, finely phrased it as "the settled principle of both law and equity that contractual provisions for forfeiture are looked upon with disfavor, and will not be enforced if the result of a forfeiture will be unconscionable". In every case the obligee must, nevertheless, be indemnified within the purview of the agreement.

■ The District Court should be given an opportunity to try the cause on an issue of the legal stature of the special agreement. If found in the circumstances to stipulate a forfeiture, the Court should

---

* The 17th station had since been condemned by the State.

determine whether it ought enforce or lift the forfeit, and shape the appropriate decree.

In the trial the Court can take into consideration the overall arrangement for the stations, the respective obligations of the parties, and the intention and purpose of each in entering into the relationship. This study should note the predominant aim of Crown was to secure outlets for its products, and unless Port abides by its agreements—or Crown is allowed to compel it to do so—Crown's very object in contracting will be frustrated. At the same time, the loss of the stations by Port would be indeed a crippling blow. In balancing these consequences the evidence in the record bearing on the respective rents payable by Crown and Port, the difference—if any—between stipulated and fair market rentals, and subsidies—in whatever form—allowed to Port from Crown would be pertinent.

A decision upholding Crown's claim for return of the stations, without more, would be implemented by a decree fixing the time and other terms of Port's eviction and relinquishment. On the other hand, in designing a decree withholding possession from Crown, the Court might find it advisable to accept Port's proffer to pay off the bank loans and then make Crown whole for Port's breaches by an award of monetary damages. The distributor agreement gives Crown, aside from the power of rescission, the right to liquidated damages as well as to enforcement of a lien for products not taken by Port. The through-put has its own peculiar remedy—the stipulated per barrel compensation. As to damages, the District Judge will notice the stipulations made at the pre-trial conference of March 2, 1960, unless he feels other allowances more fitting.

■ III. Resolution of the forfeiture question may, however, be affected by success of the antitrust plea. The District Judge, as already noted, concluded that the distributor agreement's requirement of Port to purchase all its petroleum from Crown was impotent—a restraint on trade in contravention of the antitrust laws. But so sketchy was the exploration and presentation of this defense at trial that we are unwilling to decide it on the present spare record. The volume of Port's total sales is mentioned and also their ratio to the entire amount of petroleum sold in the area. Other evidence apposite to the controversy is Port's assertion that it had always been understood between the parties that Port might buy—and was buying—petroleum products from other sources.

But even with this amplification the antitrust issue, we think, should be retried. If the agreement is found to violate the law, the District Court will determine the impact, if any, of its decision on the entire, composite arrangement between Crown and Port.

IV. Since January 1, 1958 Port has not paid Crown the 7.5 cents per barrel for purchase deficiencies under the through-put agreement. Crown, as stated, sues for payments accruing between January 1, 1958 and the expiration of the agreement on December 31, 1959. The District Court denied the claim in toto, holding that Crown had first abjured the agreement. In this we find error.

■ If there was breach of the agreement on January 10, 1957 as Port charges, it was waived by Port's reliance upon the agreement in repeated subsequent purchases. Moreover, Port paid Crown for the deficiency throughout the entire year 1957.

■ The evidence does not sustain the finding that on February 20, 1958 Crown refused to honor Port's orders for kerosene. The preponderant proof is that Crown filled two substantial orders for Port on that day. No other customer received kerosene on the same date. There was a shortage of the fuel, and at close of business on February 20, 1958 Crown had but 159,320 gallons—slightly more than the total sales for February 18, 19 and 20.

The only evidence for Port was testimony by one of its drivers who stated he had been refused kerosene on February 20 by a representative of the terminal

company (not even an agent or employee of Crown). The driver said he had been *told by the terminal's representative* that the representative had been *told by Crown's agents* not to make deliveries to Port on February 20. The representative was not called, so against double hearsay stood Crown's authenticated record of February 20 deliveries to Port.

Port itself could hardly have thought the through-put agreement dissolved by events of January 10, 1957 or even of February 20, 1958: not until March 13, 1959 did it give Crown notice it was terminating the agreement for these incidents. On the present record Crown is entitled to judgment against Port for deficiencies from January 1, 1958 until December 31, 1959 (its expiration date) with appropriate interest thereon. However, this claim may be affected by decision of the other issues heretofore discussed, and our remand of the action is to be read as a direction to the District Court to consider the claim in this light.

The order of the District Court will be reversed and a new trial ordered, to be held in conformity with this opinion.

Reversed and remanded.